**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| SIERRA CLUB; SOUTHERN BORDER COMMUNITIES COALITION, | No. 19-17501 |
| | D.C. No. 4:19-cv-00892-HSG |
| Plaintiffs-Appellees, | |
| v. | OPINION |
| DONALD J. TRUMP, in his official capacity as President of the United States; MARK T. ESPER, in his official capacity as Acting Secretary of Defense; CHAD F. WOLF, in his official capacity as Acting Secretary of Homeland Security; STEVEN TERNER MNUCHIN, in his official capacity as Secretary of the Treasury, | |
| Defendants-Appellants. | |

| | |
|---|---|
| STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF HAWAII; STATE OF MARYLAND; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; STATE OF WISCONSIN; COMMONWEALTH OF VIRGINIA, | No. 19-17502 |
| | D.C. No. 4:19-cv-00872-HSG |
| Plaintiffs-Appellees, | |
| and | |

STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF MAINE; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEVADA; STATE OF ILLINOIS; DANA NESSEL, Attorney General, on behalf of the People of Michigan; STATE OF MASSACHUSETTS; STATE OF VERMONT; STATE OF RHODE ISLAND,

Plaintiffs

v.

DONALD J. TRUMP, in his official capacity as President of the United States of America; UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF DEFENSE; MARK T. ESPER, in his official capacity as Acting Secretary of Defense; RYAN D. MCCARTHY, in his official capacity as the Secretary of the Army; KENNETH J. BRAITHWAITE, in his official capacity as Secretary of the Navy; BARBARA M. BARRETT, in her official capacity as Secretary of the Air Force; UNITED STATES DEPARTMENT OF THE TREASURY; STEVEN TERNER MNUCHIN, in his official capacity as Secretary of the Department of the Treasury; U.S. DEPARTMENT OF THE INTERIOR; DAVID BERNHARDT, in his official capacity as Secretary of the Interior; U.S. DEPARTMENT OF HOMELAND SECURITY; CHAD F.

WOLF, in his official capacity as Acting Secretary of Homeland Security,

Defendants-Appellants.

---

STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF HAWAII; STATE OF MARYLAND; STATE OF NEW YORK; STATE OF NEW MEXICO; STATE OF OREGON; COMMONWEALTH OF VIRGINIA; STATE OF WISCONSIN,

Plaintiffs-Appellants,

and

STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF MAINE; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEVADA; STATE OF ILLINOIS; DANA NESSEL, Attorney General, on behalf of the People of Michigan; STATE OF MASSACHUSETTS; STATE OF VERMONT; STATE OF RHODE ISLAND,

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States of America; UNITED STATES OF

No.   20-15044

D.C. No. 4:19-cv-00872-HSG

AMERICA; UNITED STATES DEPARTMENT OF DEFENSE; MARK T. ESPER, in his official capacity as Acting Secretary of Defense; RYAN D. MCCARTHY, senior official performing the duties of the Secretary of the Army; KENNETH J. BRAITHWAITE, in his official capacity as Secretary of the Navy; BARBARA M. BARRETT, in her official capacity as Secretary of the Air Force; UNITED STATES DEPARTMENT OF THE TREASURY; STEVEN TERNER MNUCHIN, in his official capacity as Secretary of the Department of the Treasury; U.S. DEPARTMENT OF THE INTERIOR; DAVID BERNHARDT, in his official capacity as Secretary of the Interior; U.S. DEPARTMENT OF HOMELAND SECURITY; CHAD F. WOLF, in his official capacity as Acting Secretary of Homeland Security,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of California
Haywood S. Gilliam, Jr., District Judge, Presiding

Argued and Submitted March 10, 2020
San Francisco, California

BEFORE: THOMAS, Chief Judge, and WARDLAW and COLLINS, Circuit Judges

Opinion by Chief Judge Sidney R. Thomas;
Dissent by Judge Collins

4

THOMAS, Chief Judge:

This appeal presents the question of whether the emergency military construction authority provided by 10 U.S.C. § 2808 ("Section 2808") authorized eleven border wall construction projects on the southern border of the United States. We conclude that it did not. We also consider whether the district court properly granted the Organizational Plaintiffs a permanent injunction and whether the district court improperly denied the State Plaintiffs' request for a separate permanent injunction. We affirm the decision of the district court on both counts.

I

Following the longest partial government shutdown in United States history, Congress passed the 2019 Consolidated Appropriations Act ("2019 CAA") on February 14, 2019. Pub. L. No. 116-6, div. A, 133 Stat. 13 (2019). Although the President requested $5.7 billion for border wall construction, the 2019 CAA made available only $1.375 billion "for the construction of primary pedestrian fencing . . . in the Rio Grande Valley Sector [in Texas]." On February 15, 2019 the President signed the 2019 CAA into law, but announced that he was "not happy" with the amount of border wall funding he had obtained. *Remarks by President Trump on the National Security and Humanitarian Crisis on Our Southern Border,*

White House at 12 (Feb. 15, 2019), https://perma.cc/5SE7-FS7F ("*Rose Garden Remarks*").

On the same day, the President invoked his authority under the National Emergencies Act, 50 U.S.C. § 1601 *et seq.* (the "NEA") to declare that "a national emergency exists at the southern border of the United States." *See Proclamation No. 9844*, 84 Fed. Reg. 4,949 (Feb. 15, 2019). The national emergency proclamation also "declare[d] that this emergency requires use of the Armed Forces," and made available "the construction authority provided in [Section 2808]." *Id.* The President explained that, even though he had obtained some border wall funding, he declared a national emergency because although he "could do the wall over a longer period of time" by going through Congress, he would "rather do it much faster." *Rose Garden Remarks* at 12.

Since February 2019, Congress has attempted to terminate the national emergency on two separate occasions. On March 14, 2019, Congress passed a joint resolution to terminate the emergency declaration, but it was vetoed the next day by the President, and Congress failed to override the Presidential veto. *See* H.R.J. Res. 46, 116th Cong. (2019); 165 Cong. Rec. H2799, H2814–15 (2019). On September 27, 2019, Congress passed a second joint resolution to terminate the emergency declaration, but once again, the President vetoed this resolution,

and Congress failed to override the veto. *See* S.J. Res. 54, 116th Cong. (2019); 165 Cong. Rec. S5855, S5874–75 (2019).

Congress has an ongoing obligation to consider whether to terminate the emergency every six months, but the President renewed the declaration of a national emergency on February 13, 2020. *Message to Congress on the Continuation of the National Emergency with Respect to the Southern Border of the United States*, White House (Feb. 13, 2020).

Although the President's declaration of a national emergency was issued in February 2019, the administration did not announce that it had made a decision to divert the funds until September 3, 2019, when the Secretary of Defense announced that it was necessary to divert $3.6 billion from military construction projects to border wall construction projects.

The Secretary of Defense announced that the funds would be diverted to fund eleven specific border wall construction projects in California, Arizona, New Mexico, and Texas. Altogether, the projects include 175 miles of border wall. The projects fall into three basic categories: (1) two projects on the Barry M. Goldwater Range military installation in Arizona, (2) seven projects on federal public domain land that is under the jurisdiction of the Department of the Interior, and (3) two projects on non-public land that would need to be acquired through

either purchase or condemnation before construction could begin. The first two projects would be built on the Goldwater Range, and "the remaining nine will be built on land assigned to Fort Bliss, an Army base," with its headquarters in El Paso, Texas.

On September 5, 2019, the Secretary of Defense identified which military construction projects the Department of Defense ("DoD") intended to defer in order to fund border wall construction. The Secretary authorized the diversion of funding from 128 military construction projects, 64 of which are located within the United States, and 17 of which are located within the territory of the Plaintiff States—California, Colorado, Hawai'i, Maryland, New Mexico, Oregon, Virginia, and Wisconsin—totaling over $500 million in funds.[1] Pursuant to Section 2808, the Secretary authorized the Federal Defendants to proceed with construction without complying with environmental laws.

II

The Organizational Plaintiffs in this case, Sierra Club and the Southern Border Communities Coalition ("SBCC") (collectively, "Sierra Club") and the

---

[1] Although there are 19 total defunded projects within the Plaintiff States, the States only assert harms from 17 of these projects.

State Plaintiffs[2] filed separate suits challenging the Federal Defendants'[3]

anticipated diversion of federal funds to fund border wall construction pursuant to

various statutory authorities, including Section 2808.  *See Sierra Club v. Trump*,

No. 19-cv-00892-HSG; *California v. Trump*, No. 19-cv-00872-HSG.

In both cases, the parties first litigated the claims challenging the Federal

Defendants' transfer of funds pursuant to Section 8005 and Section 9002 of the

Department of Defense Appropriations Act of 2019, Pub. L. No. 115-245, 132

Stat. 2981 (2018) ("Section 8005")—the claims that were the subject of the prior

appeals considered by this panel.  The parties agreed that while litigating the

Section 8005 claims, they would stay the summary judgment briefing schedule as

to the Section 2808 funds until the Acting Secretary of Defense and U.S. Customs

and Border Protection ("CBP") reached a final decision to fund specific border

wall projects using Section 2808.  The Secretary of Defense reached this final

---

[2] Specifically, the action was filed by the following states: California, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, the Commonwealth of Virginia, and Attorney General Dana Nessel on behalf of the People of Michigan. The complaint was later amended to add the following states: Rhode Island, Vermont, Wisconsin, and the Commonwealth of Massachusetts.

[3] Both lawsuits named as defendants Donald J. Trump, President of the United States, Patrick M. Shanahan, Former Acting Secretary of Defense, Kirstjen M. Nielsen, former Secretary of Homeland Security, and Steven Mnuchin, Acting Secretary of the Treasury in their official capacities, along with numerous other Executive Branch officials (collectively referenced as "the Federal Defendants").

decision on September 3, 2019, and the Federal Defendants filed a Notice of Decision in both cases pending before the district court.

Nine states, including California, Colorado, Hawai'i, Maryland, New Mexico, New York, Oregon, Wisconsin, and the Commonwealth of Virginia (collectively, the "States"), filed a motion for partial summary judgment on their Section 2808 claims on October 11, 2019 in *California v. Trump*. On the same day, Sierra Club filed a motion for partial summary judgment on its Section 2808 claims in *Sierra Club v. Trump*.

On December 11, 2019, in a single opinion addressing the claims of both State and Sierra Club Plaintiffs, the district court granted summary judgment and a declaratory judgment to the Plaintiffs on their Section 2808 claims with respect to the eleven border wall construction projects. It granted Sierra Club's request for a permanent injunction, enjoining "Defendants Mark T. Esper, in his official capacity as Secretary of Defense; and Chad F. Wolf, in his official capacity as Acting Secretary of Homeland Security" as well as "all persons acting under their direction" "from using military construction funds appropriated for other purposes to build a border wall" in the areas identified as "Yuma Project 2; Yuma Project 10/27; Yuma Project 3; Yuma Project 6; San Diego Project 4; San Diego Project 11; El Paso Project 2; El Paso Project 8; Laredo Project 5; Laredo Project 7; El

10

Centro Project 5; and El Centro Project 9." The district court denied the States' "duplicative request for a permanent injunction as moot." However, the district court *sua sponte* stayed the Sierra Club permanent injunction pending appeal pursuant to Fed. R. Civ. P. 62(c). It explained that "the Supreme Court's stay of this Court's prior injunction order appears to reflect the conclusion of a majority of that Court that the challenged construction should be permitted to proceed pending resolution of the merits." Therefore, the district court determined that "the lengthy history of this action; the prior appellate record; and the pending appeal before the Ninth Circuit on the merits of Plaintiffs' Section 8005 claim . . . warrant a stay." The district court properly considered the relevant factors and certified its order for immediate appeal pursuant to Fed. R. Civ. P. 54(b).

The Federal Defendants timely appealed the district court's grant of summary judgment and declaratory relief to Sierra Club and the States and the grant of a permanent injunction to Sierra Club. The States timely cross-appealed the district court's denial of their request for a permanent injunction.

### III

We first provide a brief background of the statutory framework at issue: the National Emergencies Act. The NEA empowers the President to declare national emergencies. It states that "[w]ith respect to Acts of Congress authorizing the

11

exercise, during the period of a national emergency, of any special or extraordinary power, the President is authorized to declare such a national emergency." 50 U.S.C. § 1621(a). The statute invoked by the Federal Defendants is one such Act of Congress that authorizes military construction in the event of a national emergency. 10 U.S.C. § 2808 provides that

> In the event of a declaration of war or the declaration by the President of a national emergency in accordance with the National Emergencies Act (50 U.S.C. 1601 et seq.) that requires use of the armed forces, the Secretary of Defense, without regard to any other provision of law, may undertake military construction projects, and may authorize the Secretaries of the military departments to undertake military construction projects, not otherwise authorized by law that are necessary to support such use of the armed forces.

Although the NEA empowers presidential action in national emergencies, it also empowers Congress to check that action. The NEA's legislative history makes clear that it was passed to "[e]nsure that the powers now in the hands of the Executive will be utilized only in time of genuine emergency and then only under safeguards providing for Congressional review," and that it "[was] not intended to enlarge or add to Executive power." *The National Emergencies Act (Public Law 94-412), Source Book: Legislative History, Text, and Other Documents* 50, 292 (1976) ("*NEA Source Book*"). Instead it was "an effort by the Congress to establish clear procedures and safeguards for the exercise by the President of emergency powers conferred upon him by other statutes." *Id.* at 292.

12

As originally enacted, the NEA allowed Congress to terminate any national emergency declared by the President by concurrent resolution. *See* Pub. L. 94–412, 90 Stat. 1255, §202(a)(1) (1976) ("Any national emergency declared by the President in accordance with this title shall terminate if . . . Congress terminates the emergency by concurrent resolution."). However, the landmark Supreme Court decision, *INS v. Chadha*, 462 U.S. 919, 959 (1983), held that concurrent resolutions are unconstitutional, thus invalidating Congress's strongest check on the President's emergency powers. In response, Congress amended the NEA to allow for the termination of an emergency declaration if "there is enacted into law a joint resolution terminating the emergency." 10 U.S.C. § 1622(a)(1). *Chadha*, therefore, made it more difficult for Congress to check the President's use of emergency powers than originally intended.

Until now, *Chadha* had little impact because, prior to the President's declaration of a national emergency on the southern border, Congress had never once voted to terminate a declaration of a national emergency. Indeed, Section 2808 has only been invoked once to fund construction on American soil, and it has never been used to fund projects for which Congress withheld appropriations. Thus, this case operates against the background of the first serious clash between

13

the political branches over the emergency powers since the passage of the NEA in 1976.[4]

IV

We first consider whether Plaintiffs are the proper parties to challenge the Federal Defendants' actions. We conclude that Plaintiffs have Article III standing and a cause of action to challenge the border wall construction projects.

A

Although the Federal Defendants do not challenge either the States' or Sierra Club's Article III standing, we have "an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). In order to establish Article III standing, a plaintiff must have (1) suffered an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, and (3) likely to be redressed by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). When there are multiple plaintiffs, "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017). At summary judgment,

---

[4] The U.S. House of Representatives is also involved in this litigation as an amicus curiae supporting the Plaintiffs.

a plaintiff cannot rest on mere allegations, but "must set forth by affidavit or other evidence specific facts." *Clapper v. Amnesty Int'l. USA*, 568 U.S. 398, 412 (2013) (internal quotations and citations omitted). However, these specific facts "for purposes of the summary judgment motion will be taken to be true." *Lujan*, 504 U.S. at 561.

1

The States put forth three different injuries in support of Article III standing. We conclude that border wall construction will inflict environmental and quasi-sovereign injuries in fact upon California and New Mexico and economic injuries in fact upon the remaining states. We conclude that all nine states have standing.

a

California and New Mexico will suffer injuries similar to those asserted in the prior appeals. States are "entitled to special solicitude in our standing analysis." *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007). As a quasi-sovereign, a state "has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain." *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907). Thus, a state may sue to assert its "quasi-sovereign interest in the health and well-being—both physical and economic—of its

residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982). In addition, "[d]istinct from but related to the general well-being of its residents, the State has an interest in securing observance of the terms under which it participates in the federal system." *Id*. at 607–08.

California will suffer an injury in fact based on its environmental injuries. California asserts that it "has an interest in the natural resources of [its] State—such as wildlife, fish, and water—that are held in trust by the State for its residents and are protected by state and federal laws." If construction occurs, "dozens of sensitive plant and animal species that are listed as 'endangered,' 'threatened,' or 'rare' will be seriously at risk," and construction will "create environmental harm." For instance, the border wall construction projects will undermine the recovery of several federally listed endangered species and

California Species of Special Concern[5] and damage those species' habitats. San Diego Project 4 and 11 fall within the California Floristic Province, one of the world's biodiversity hotspots, which contains plants not found elsewhere in the United States, construction will likely have detrimental effects on the Quino Checkerspot Butterfly, the Coastal California Gnatcatcher, the Western Burrowing Owl, and vernal pool habitat and species, among other species.

California has adequately set forth facts and other evidence, which, taken as true, support these allegations for the purpose of Article III standing. It has demonstrated that border wall construction will injure its environmental interests.

The proposed construction areas for San Diego Projects 4 and 11 "would cut through designated critical habitat for the endangered Quino Checkerspot Butterfly," which has "been documented immediately adjacent to the border fence

---

[5] A species of special concern is "a species, subspecies, or distinct population of an animal native to California that currently satisfies one or more of the following (but not necessarily mutually exclusive) criteria: is extirpated from the State . . .; is listed as Federally-, but not State-, threatened or endangered; meets the State definition of threatened or endangered but has not formally been listed; is experiencing, or formerly experienced, serious (noncyclical) population declines or range retractions (not reversed) that, if continued or resumed, could qualify it for State threatened or endangered status; has naturally small populations exhibiting high susceptibility to risk from any factor(s), that if realized, could lead to declines that would qualify it for State threatened or endangered species." CAL. DEPT. OF FISH AND WILDLIFE, SPECIES OF SPECIAL CONCERN, https://wildlife.ca.gov/Conservation/SSC.

and on the surrounding slopes to the north, well within the proposed project area." The "proposed work, including resurfacing of the roadways where the butterfly and its host plants have been found, will crush and bury diapausing larvae and host plant seed bank in the area," causing "irreparable harm to the Quino Checkerspot Butterfly population and its critical habitat on Otay Mesa."

Gnatcatchers are found within the project area for San Diego Project 4, and construction activities "will result in significant displacement of California gnatcatchers into already diminished and limited habitat areas." Because the species is "restricted to coastal southern California in areas of open coastal sage scrub," and gnatcatcher "territories average approximately 9 acres," gnatcatchers affected by construction "will either be required to move or challenge adjacent pairs for their occupied territories," ultimately resulting in "a substantial reduction of the population in the area, and irreparable harm to the species and its habitat."

San Diego Project 4 would also harm the Western Burrowing Owl. The owl is "restricted to the western U.S. and northern Mexico," owls occur in the project area, and eastern Otay Mesa, where San Diego Project 4 is expected to occur, "is the last stronghold for the species in the County." The "loss of both occupied burrows and foraging habitat [where construction takes place] will only hasten [the owl's] decline." The owl will be further impacted because it is

"especially sensitive to construction due to [its] unique behavior," and it is "easily flushed [from its burrows] by adjacent human disturbance or activities." "Repeated flushing during periods of incubation or while feeding chicks has extremely negative effects, including cooling of eggs, reduced feeding of chicks, or increased exposure to predators, reducing the percentage of chicks surviving to adulthood."

San Diego Project 4 will also impact and harm delicate vernal-pool habitats, which are home to a number of endangered species, like the San Diego Fairy Shrimp. The landscape "leading to San Diego 4[] supports numerous vernal pools," and "[s]everal of these pools occur within and adjacent to dirt roads that will be utilized by heavy equipment, and where additional grading, vegetation clearing and filling may occur," which "would damage vernal pools and cause irreparable harm to the fairy shrimp and other vernal pool species."

New Mexico will also suffer an injury in fact based on its environmental injuries. If the New Mexico Projects are built, they will "impose environmental harm to the State" and the damage "would include the blocking of wildlife migration, flooding, and habitat loss." The New Mexico Projects will be built primarily in the "Bootheel" of New Mexico in the Animas and Playas Valleys, an area in southwestern New Mexico that is a "pinch point for ecological diversity,

19

migration, and dispersal in the western North American continent." Border wall construction "for the New Mexico Projects will create fragmented habitat and block wildlife corridors for numerous protected species" such as the white-sided jackrabbit, a rare and threatened species under New Mexico law, and the jaguar, a federally endangered species.

New Mexico has also adequately set forth facts and other evidence, which, taken as true, support these allegations for the purpose of Article III standing. It has demonstrated that border wall construction will injure its environmental interests.

"Currently, the only area that the white-sided jackrabbit . . . inhabits in the United States is in the Animas and Playas Valleys, where the proposed El Paso 2 and 8 Projects are being constructed." The "species is already in distress and its numbers are falling due to habitat loss and roadkill incidents from U.S. Border Patrol vehicles which increased dramatically after Customs and Border Protection completed road improvements in 2008." The current population "is estimated to be 61 hares." The hares "cross back and forth" across the US-Mexico border "to avoid predators, and to access food, water and mates," but construction would block crossings because the border wall's "steel concrete-filled bollards [are] spaced four inches apart," and "jackrabbits cannot fit through the 4-inch gaps." El

Paso Project 8 and the eastern portion of El Paso Project 2 block important habitat corridors for the hare, including "the sole route the hares can utilize to access habitat on both sides of the border because they cannot navigate the mountainous terrain that surrounds the Animas and Playas Valleys." Construction would therefore "cut off the last remaining population of the white-sided jackrabbit in the United States," and "[t]he outlook for the jackrabbit's survival in New Mexico and the United States [would be] dismal if El Paso 2 and 8 are built."

Likewise, "[c]onstruction of El Paso 2 and 8 will also harm the federally endangered jaguar . . . as both projects are immediately adjacent to the jaguar's critical habitat." Jaguars have been documented in the region, including on "lands that directly adjoin the location of El Paso 2 Project in the Animas Valley." "Habitat connectivity is critical to the jaguar's survival," because "[t]he jaguar's survival depends on it being able to access habitat on both sides of the U.S.-Mexican border to access prey, mate and suitable habitat," but the "El Paso Projects impede the jaguar's recovery by blocking a key wildlife corridor."

In addition, California will suffer an injury in fact to its quasi-sovereign interests. California has alleged that it has "an interest in its exercise of sovereign power over individuals and entities within the State, including enforcement of its legal code." The Federal Defendants ordinarily would have to comply with

21

various California laws designed to protect public health and the environment to proceed with construction, but Section 2808 authorizes construction "without regard to any other provision of law," and the Secretary of Defense has explicitly directed that the projects be undertaken "without regard to any other provision of law that could impede . . . expeditious construction." This impacts California's ability to enforce its state laws, including, among others, the Porter-Cologne Water Quality Control Act, Cal. Water Code §§ 13000-16104, the California Endangered Species Act, Cal. Fish and Game Code §§ 2050-2089.26, and California's state implementation program under the Clean Air Act, *see* 42 U.S.C. § 7506(c)(1). Thus, California will suffer an injury to its quasi-sovereign interest in enforcing its own laws, interfering with the terms under which it participates in the federal system.

California has adequately set forth facts and other evidence, which, taken as true, support these allegations for the purpose of Article III standing.

Under California law, the California State Water Resources Control Board and nine regional boards establish water quality objectives and standards, and, for the California Projects, where the discharge of dredged or fill material into waters of the United States is expected to occur, a regional board must ordinarily certify compliance with water quality standards. The record indicates that El Centro

22

Projects 5 and 9 and Yuma Project 6 are "to be constructed, at least in part, in areas under the jurisdiction of the Colorado River Basin Water Board." Therefore, absent the use of Section 2808 authority, these projects "could normally not proceed without a Section 404 dredge and fill permit issued by the United States Army Corp of Engineers, which would in turn compel a Section 401 water quality certification" by the Colorado River Basin Water Board. The record further indicates that, "[d]ue to their nature and location of construction, El Centro Projects 5 and 9, and Yuma Project 6 normally would also require enrollment in the State Water Board's statewide [National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges Associated with Construction and Land Disturbance Activities.]"

Additionally, but for the use of Section 2808, the Federal Defendants would be required to comply with the Endangered Species Act, which protects species threatened, endangered, or of special concern under California law and allows California to continue implementing habitat conservation agreements with federal agencies that impose limitations on habitat-severing projects like the border wall construction projects. The use of Section 2808 therefore undermines California's ability to enforce the California Endangered Species Act and the "policy of the

state to conserve, protect, restore, and enhance any endangered species or any threatened species and its habitat." Cal. Fish & Game Code § 2052.

Likewise, the use of Section 2808 authority undermines California's enforcement of its air quality standards. In particular, the Clean Air Act prohibits any construction within California that does not conform to California's State Implementation Program ("SIP"). 40 C.F.R. § 93.150(a). Moreover, local air districts with jurisdiction over the California Project areas enforce rules to reduce the amount of fine particulate matter generated from construction projects by requiring those responsible to develop and implement a dust control plan. Although the Federal Defendants assert they "will implement control measures," implementing control measures is not the same as implementing a complete dust control plan, and there is no indication that the Federal Defendants intend to comply fully with California's air quality laws.

New Mexico will also suffer an injury in fact to its quasi-sovereign interests. The Federal Defendants would ordinarily have to comply with various New Mexico laws designed to protect public health and the environment. Such laws include the dust control plan New Mexico adopted under the Clean Air Act and its Wildlife Corridors Act, N.M. Stat. Ann. §§ 17-9-1-17-9-4. Thus, New

24

Mexico too suffers an injury to its quasi-sovereign interest in enforcing its own laws, interfering with the terms under which it participates in the federal system.

New Mexico has adequately set forth facts and other evidence, which, taken as true, support these allegations for the purpose of Article III standing.

Absent the use of Section 2808 authority, the Federal Defendants would normally be required to comply with New Mexico's fugitive dust control rule and the High Wind Fugitive Dust Mitigation Plan that New Mexico adopted under the Clean Air Act in order to construct El Paso Project 2.  40 C.F.R. § 51.930(b); *see* N.M. Admin. Code §§ 20.2.23.109-112 (mandating that "[n]o person . . . shall cause or allow visible emissions from fugitive dust sources that: . . . pose a threat to public health . . . interfere with public welfare, including animal or plant injury or damage, visibility or the reasonable use of property" and "[e]very person subject to this part shall utilize one or more dust control measures . . . as necessary to meet the requirements of [this section]").  Although the Federal Defendants assert that they plan to implement control measures, they have not indicated that they intend to be bound in any way by New Mexico's law.

Likewise, the Federal Defendants' use of Section 2808 authority impedes New Mexico's ability to implement its Wildlife Corridors Act, which aims to protect large mammals' habitat corridors from human-caused barriers such as

25

roads and walls and requires New Mexico agencies to create wildlife corridors action plans to protect species' habitat. 2019 N.M. Laws Ch. 97. Several important wildlife corridors run through, or adjacent to, the New Mexico Projects in Hidalgo and Luna Counties. "El Paso Projects 2 and 8 will . . . block habitat corridors," in these counties for "wildlife species that currently cross back and forth over the border to access habitat, vegetation, water and other resources." "[P]articularly when viewed cumulatively with other recent border-barrier projects such as El Paso Project 1," the loss of wildlife corridors will impede species' "access to resources necessary for their survival."

Moreover, the New Mexico Projects will harm species that New Mexico's laws were enacted to protect, such as the white-sided jackrabbit, as previously explained. The Projects will bisect important habitats, impairing the access of the Mexican wolf to those habitats. In sum, California and New Mexico have adequately shown one or more injuries in fact supported by facts and evidence.

Turning to the causation requirement, we conclude that California and New Mexico will suffer both environmental and sovereign injuries that are fairly traceable to the Federal Defendants' conduct. The declarations in support of the environmental harms clearly demonstrate how the proposed construction will

26

harm species, and Section 2808 itself provides the authority for the Secretary of Defense to override state environmental laws.

It is also clear that a favorable judicial decision would redress California and New Mexico's asserted injuries. Without Section 2808 authorization, DoD has no authority to undertake border wall construction, and, if construction is prohibited, California and New Mexico will not suffer the alleged harms. We therefore conclude California and New Mexico have Article III standing to challenge the construction projects on their borders.

b

The remaining states assert theories of economic loss and the loss of tax revenues as the basis for standing. Economic loss and the loss of tax revenues can be sufficient to establish Article III injury in fact. *See, e.g.*, *Wyoming v. Oklahoma*, 502 U.S. 437, 447 (1992) (holding that the loss of specific tax revenues conferred standing); *City of Oakland v. Lynch*, 798 F.3d 1159, 1163–64 (9th Cir. 2015) (recognizing that an expected loss of tax revenues constitutes a "constitutionally sufficient" injury for Article III standing); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1194, 1198–99 (9th Cir. 2004) (recognizing financial harm from decreased tax revenues as a cognizable injury). It may be appropriate to deny standing where a state claims only that "actions taken by United States

Government agencies . . . injured a State's economy and thereby caused a decline in general tax revenues." *Wyoming v. Oklahoma*, 502 U.S. at 448 (citing *Pennsylvania v. Kleppe*, 533 F.2d 668 (D.C. Cir. 1976), *cert. denied*, 429 U.S. 977 (1976), as an example). But where there is "some fairly direct link between the state's status as a collector and recipient of revenues and the legislative or administrative action being challenged," lost tax revenues can support Article III standing. *Kleppe*, 533 F.2d at 672.

The States have each individually alleged that the Section 2808 diversion of funds will result in economic losses, including lost tax revenues. The loss of tax revenues here is analogous to those in *Wyoming v. Oklahoma*. There, Wyoming challenged an Oklahoma law requiring Oklahoma utility companies using coal-fired generating plants to blend ten percent Oklahoma coal with their existing coal sources, which had been purchased almost entirely from Wyoming. *Id.* at 443, 445. Wyoming did not sell coal directly, but it imposed a severance tax on any person or company extracting coal from within its borders. *Id.* at 442. The Supreme Court agreed that Wyoming had standing because there was "a direct injury in the form of a loss of specific tax revenues." *Id.* at 448, 451. Here, the States have alleged analogous, direct injuries in the form of lost tax revenues resulting from the cancellation of specific military construction projects.

28

Colorado has standing based on its economic injury and loss of tax revenues because it faces the defunding of a Space Control Facility at the Peterson Air Force Base resulting in an estimated loss of $1 million in state and local tax revenues.

Hawai'i has standing based on its economic injury and loss of tax revenues because it faces the defunding of two projects—a consolidated training facility at the Joint Base Pearl Harbor-Hickam and security improvements at the Marine Corps base at Kaneohe Bay—resulting in an estimated loss of $2.5 million in state and local tax revenues.

Maryland has standing based on its economic injury and loss of tax revenues because it faces the defunding of three projects—an expansion of cantonment area roads at Fort Meade, construction of a hazardous cargo loading and unloading pad and an explosive ordinance disposal training range at Joint Base Andrews, and construction of a child development center at Joint Base Andrews—resulting in an estimated loss of $5 million in state and local tax revenues.

New Mexico also has standing based on its economic injury and loss of tax revenues because it faces defunding of two projects—the construction of an air combat training facility for unmanned vehicles at Holloman Air Force Base and

an Information Systems Facility at White Sands Missile Range—resulting in an estimated loss of $9 million in state and local tax revenues.

New York has standing based on its economic injury and loss of tax revenues because it faces the defunding of two projects—an Engineering Center and Parking Structure at the U.S. Military Academy at West Point—resulting in an estimated loss of $13 million in state and local tax revenues.

Oregon has standing based on its economic injury and loss of tax revenues because it faces the defunding of the construction of an indoor small arms training range at the Klamath Falls International Airport resulting in an estimated loss of $600,000 in state and local tax revenues.

Virginia has standing based on its economic injury and loss of tax revenues because it faces the defunding of four projects—the construction of a cyber operations facility at Joint Base Langley-Eustis, the replacement of two different Hazardous Materials Warehouses at Norfolk Naval Station in Norfolk and the Norfolk Naval Shipyard in Portsmouth, and the conversion and repair of a major Ships Maintenance Facility at the Naval Support Station in Portsmouth—resulting in an estimated loss of $5 million in state and local tax revenues.

Wisconsin has standing based on its economic injury and loss of tax revenues because it faces the defunding of the construction of an indoor small

30

arms training range at Truax Field resulting in an estimated loss of $600,000 in state and local tax revenues.

The injuries are "fairly traceable" to the Federal Defendants' conduct. The States have illustrated that there is a "line of causation between the [Federal Defendants'] action and [their] harm" that is "more than attenuated." *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1141 (9th Cir. 2013) (citation omitted). The States have illustrated that the lost revenues stem from identifiable projects, directly linking the States' statuses as collectors and recipients of revenues to the challenged actions. Moreover, the States' expert calculated the estimated loss of tax revenues with the widely-used IMPLAN economic model that takes into account specific details about each defunded military construction project from the Federal Defendants' own information regarding each project. The expert's "analysis conservatively included only projects within the plaintiff states' boundaries because the diversion of those projects would have primary effects on the plaintiff states," and the analysis did not consider "the secondary effects of defendants' diversion of military construction projects located in other states and counties," thus ensuring that the calculated losses accounted for here are not too attenuated for purposes of Article III.

A favorable judicial decision barring Section 2808 construction would prevent the military construction funds at issue from being transferred from projects within the States to border wall construction projects, thereby preventing the alleged injuries. Therefore, the States' losses, as outlined here, satisfy the demands of Article III standing. We conclude that all nine states have standing to challenge the border wall construction projects.

2

Sierra Club and SBCC also have standing. An organization has standing to sue when "its members would otherwise have standing to sue in their own right," and when "the interests it seeks to protect are germane to the organization's purpose." *United Food and Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). An organization may also have standing to sue on its own behalf when it suffers "both a diversion of its resources and a frustration of its mission." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (quoting *Fair Housing of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002)). The organization "must . . . show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *Id.*

32

Sierra Club has standing to sue on behalf of its members. It has alleged that the Federal Defendants' actions will cause particularized and concrete injuries to its members. Sierra Club has more than 400,000 members in California, over 9,700 of whom belong to its San Diego Chapter. Sierra Club's Grand Canyon Chapter, which covers the State of Arizona, has more than 16,000 members. Sierra Club's Rio Grande Chapter includes over 10,000 members in New Mexico and West Texas. Sierra Club's Lone Star Chapter, which covers the State of Texas, has over 26,100 members, more than 440 of whom live in the Lower Rio Grande Valley.

These members visit border areas such as: the Tijuana Estuary (California), the Otay Mountain Wilderness (California), the Jacumba Wilderness Area (California), the Sonoran Desert (Arizona), Cabeza Prieta National Wildlife Refuge (Arizona), the Chihuahan Desert (New Mexico), Santa Ana National Wildlife Refuge (Texas), the Lower Rio Grande Valley National Wildlife Refuge (Texas), Bentsen-Rio Grande Valley State Park (Texas), La Lomita Historical Park (Texas), and the National Butterfly Center (Texas).

Sierra Club's members obtain recreational, professional, scientific, educational, and aesthetic benefits from their activities along the U.S.-Mexico border, and from the wildlife dependent upon the habitat in these areas. The

33

construction of a border wall and related infrastructure will acutely injure these interests because the Department of Homeland Security ("DHS") is proceeding with border wall construction without ensuring compliance with any federal or state environmental regulations designed to protect these interests.

Sierra Club has adequately set forth facts and other evidence, which, taken as true, support these allegations for the purpose of Article III standing.

For instance, Sierra Club member Bill Broyles has a "substantial professional and personal connection to the lands identified for construction as projects Yuma 2 and 10/27 (on the Goldwater Range) and Yuma 3 (on Cabeza Prieta)." He has "written and edited several books and articles on Cabeza Prieta and the Goldwater Range," and he "also co-wrote and co-published a visitor's guide to the historic trail, El Camino del Diablo, that the proposed wall parallels and crosses, and that would be harmed by construction vehicle traffic." He participated in many meetings sponsored by the Range and Refuge concerning their management plans over the years. He believes that the "proposed wall is antithetical to [the] successful cooperative efforts of the Range and Refuge partners," and it would "desecrate" the historic El Camino del Diablo. He asserts that harm to wildlife species, "the incessant lighting associated with the wall and

34

its construction," and the "attendant noise and dust" of construction will harm his enjoyment of these areas.

Sierra Club member Orson Bevins lives near the U.S.-Mexico border and states that Yuma Sector Project 6 would "fragment" the vista he usually enjoys. He also states that the "tall and intrusive pedestrian barrier would disrupt the desert views and inhibit [him] from fully appreciating this area," and that a border wall "would greatly degrade [his] experience visiting and living in this area."

Richard Guerrero is a Sierra Club member who resides in San Diego, California, and he hikes the trails in and around the Otay Open Space Preserve "about once a month," and "often hike[s] in areas that are within the sightline of where [he] understand[s] the government plans to construct San Diego Project 4." The "wall would directly impact [his] ability to enjoy recreating in this area" by adding "a destructive human-created element to this otherwise peaceful open desert landscape."

Likewise, Sierra Club member Daniel Watman, who leads "border tours" through the Otay Mountain Wilderness, will be harmed by San Diego Project 4 and San Diego Project 11. If San Diego Project 4 is built, he will "no longer be able to lead [his] border tours because the purpose of the tours—to see nature continuing unimpeded across the border—would be lost." Moreover, he enjoys

35

visiting the bi-national town of Tecate, and he believes "San Diego 11 project would seriously reduce the enjoyment [he] get[s] from the area, because seeing this large, out-of-place wall would mar [his] views of the beautiful mountain range on the American side" and "cause extensive and possibly irreparable damage to the native flora" in the area.

Sierra Club member Robert Ardovino "currently recreate[s] in what [he] understand[s] to be the El Paso Project 2 and 8 areas," and has "done so for several decades." He claims that construction will "drastically change [his] ability to appreciate [the] views" of the "sprawling vistas near Antelope Wells," because the lighting planned for the construction projects "would completely change the landscape," and the construction would harm the species he appreciates while camping, "permanently ruin[ing]" his "use and enjoyment of these areas."

Thomas Miller is a Sierra Club member who works at Laredo College conducting environmental research with students in the Rio Grande Valley, and he asserts that Laredo Project 7 will injure him "professionally, recreationally, and aesthetically." For the last 15 years, his "research has largely focused on the now endangered Texas Hornshell Mussel." He is "concerned that [Laredo Project 7] and its construction will destroy essential habitat for freshwater mussels and other species of plants and animals," because the "construction process and the

existence of a wall would lead to river siltation when parts of the desert soil and rocks are displaced" and could potentially lead to "chemicals polluting the water sources" in the area. Likewise, Jerry Thompson, a Sierra Club member and Professor of History at Texas A&M International University, whose research focuses on "Texas history, border history, and the history of the American Civil War" asserts that Laredo Project 7 "would be extremely detrimental to [his] research and career as it would foreclose [his] ability to do site visits and visualize the area before writing about it." He has written numerous books about the Texas-Mexico border, has visited the Laredo 7 Project area around twenty times in the course of his research, intends to return within the next few years to view the section of the Rio Grande where Laredo 7 project is slated for construction, and "plan[s] to continue to write about the Texas-Mexico border."

Carmina Ramirez is a Sierra Club member who "will be harmed culturally and aesthetically" if construction proceeds for El Centro Projects 5 and 9 because she has spent her entire life in the area surrounding the U.S.-Mexico Border, including the El Centro Sector, and she believes that border wall construction would "obstruct [the] view [of the Valley area]," "divide [her community]," "further militariz[e] the border," and "drastically impact [her] ability to enjoy the local natural environment." Construction will make her "less likely to hike Mount

Signal and enjoy outdoor recreational activities; and when [she does] undertake those activities, [her] enjoyment of them will be irreparably diminished."

Lastly, the interests of Sierra Club's members in this lawsuit are germane to the organization's purpose. Sierra Club is "a national organization . . . dedicated to exploring, enjoying, and protecting the wild places of the earth; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives." Sierra Club's organizational purpose is at the heart of this lawsuit, and it easily satisfies this secondary requirement.

SBCC has also alleged facts that support its standing to sue on behalf of itself and its member organizations. SBCC alleged that, since the Federal Defendants proposed border wall construction, it has had to "mobilize[] its staff and its affiliates to monitor and respond to the diversion of funds and the construction caused by and accompanying the national emergency declaration." These "activities have consumed the majority of SBCC staff's time, thereby interfering with SBCC's core advocacy regarding border militarization, Border Patrol law-enforcement activities, and immigration reform," but it has had no choice because it "must take these actions in furtherance of its mission to protect and improve the quality of life in border communities."

SBCC has adequately set forth facts and other evidence, which, taken as true, support these allegations for the purpose of Article III standing. SBCC Director Vicki Gaubeca has confirmed that the border wall construction projects have "caused [SBCC] to reduce the time that [it] devote[s] to [its] core projects," and "frustrated SBCC's mission of advancing the dignity and human rights of border communities." SBCC has "been forced to expend resources on countering the emergency instead of on [its] other initiatives, including Border Patrol accountability, community engagement on local health and education issues, and public education about immigration policies more broadly."

Moreover, Southwest Environmental Center ("SWEC"), an organization that forms part of the SBCC, has also been harmed by the proposed construction. SWEC was founded "to reverse the accelerating loss of plants and animals worldwide through protection and restoration of native wildlife and their habitats in the southwest," and it "has been actively involved in restoring riparian and aquatic habitats along the Rio Grande in southern New Mexico and west Texas. Border wall construction projects, however, have "required SWEC to shift its focus to more urgent, defensive campaigns," and "[s]taff time and resources that would normally go towards [its] longer-term restoration efforts to protect landscapes and wildlife species . . . are instead being channeled to immediate

39

border wall advocacy." Without such defensive efforts, however, the wall will "cause[] irreversible damage to border lands that SWEC's members enjoy and cherish."

The Texas Civil Rights Project ("TCRP") is also a member organization of the SBCC and is comprised of separate programs, including a Racial and Economic Justice Program, a Voting Rights Program, and a Criminal Justice Reform Program. The "announcement of imminent land seizure and 'military construction' across 52 miles of borderlands in Laredo, Texas has caused and will continue to cause TCRP to divert scarce resources in protection of Texas landowners." TCRP has had to expand its operations into Laredo, Texas, even though Laredo is "a substantial distance from the nearest TCRP office" in Alamo, Texas, and it is "prohibitive to directly represent anyone in a region where [TCRP] do[es] not have a physical TCRP office." TCRP has had no choice but to take on this additional burden because declining to represent these landowners would undermine the organization's goal to fight for a "Texas where all communities thrive with dignity and justice and without fear."

These allegations are sufficient to establish that, if funds are diverted to the border wall construction projects, Sierra Club members and SBCC will suffer injuries in fact.

Sierra Club and SBCC have also shown that such injuries are "fairly traceable to the challenged action[s] of the [Federal Defendants], and not the result of the independent action of some third party not before the court." *Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014) (quoting *Bennett v. Spear*, 520 U.S. 154, 167 (1997)). Section 2808 is the statutory authorization for the construction, and it is therefore the direct cause of the alleged injury.

The injury to Sierra Club and SBCC is likely to be redressed by a favorable judicial decision. The Federal Defendants have no authority to undertake the border wall projects if the Court holds that Section 2808 does not authorize construction. Thus, Sierra Club and SBCC have established that they satisfy the demands of Article III standing to challenge the Federal Defendants' actions.

B

The Federal Defendants assert that the Plaintiffs do not have a cause of action. We hold that the States have a cause of action under the APA and Sierra Club has a constitutional cause of action.

1

The APA provides for judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Where a statute imposes obligations on a federal agency but the obligations do not "give rise to a

41

'private' right of action against the federal government[,] [a]n aggrieved party may pursue its remedy under the APA." *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1099 (9th Cir. 2005). The States must, however, establish that they fall within the zone of interests of the relevant statute to bring an APA claim. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) ("This Court has long held that a person suing under the APA must satisfy not only Article III's standing requirements, but an additional test: The interest he asserts must be 'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated." (quoting *Ass'n of Data Processing Serv. Org., Inc. v. Camp*, 397 U.S. 150, 153 (1970))).

Section 2808 does not confer a private right of action. Instead, like Section 8005, it delegates a narrow slice of Congress's power of the purse to DoD so that it can react quickly in the event of a declaration of war or a declaration of a national emergency. In doing so, the statute imposes certain obligations upon DoD—*i.e.*, DoD cannot invoke Section 2808 except for military construction that is necessary to support the use of the armed forces in the event of a declaration of a national emergency that requires the use of the armed forces. The States argue that DoD did not satisfy these obligations, and therefore, as aggrieved parties, they

may pursue a remedy under the APA, so long as they fall within Section 2808's zone of interests.

As a threshold matter, Section 2808 constitutes the relevant statute for the zone of interests test. "Whether a plaintiff's interest is 'arguably . . . protected . . . by the statute' within the meaning of the zone-of-interests test is to be determined *not by reference to the overall purpose of the Act* in question . . . but by reference to the *particular provision of law* upon which the plaintiff relies." *Bennett*, 520 U.S. at 175–76 (emphasis added). Because the States invoke Section 2808's limitations in asserting their APA claim, this statute defines the relevant zone of interests.

The Supreme Court has clarified that, in the APA context, the zone of interests test does "not require any 'indication of congressional purpose to benefit the would-be plaintiff.'" *Patchak*, 567 U.S. at 225 (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399–400 (1987)). Furthermore, the Court has repeatedly emphasized that the zone-of-interest test is "not 'especially demanding.'" *Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (quoting *Patchak*, 567 U.S. at 225). Instead, for APA challenges, a plaintiff can satisfy the test in either one of two ways: (1) "if it is among those [who] Congress expressly or directly indicated were the intended beneficiaries of a statute," or (2)

"if it is a suitable challenger to enforce the statute—that is, if its interests are sufficiently congruent with those of the intended beneficiaries that the litigants are not more likely to frustrate than to further . . . statutory objectives." *Scheduled Airlines Traffic Offices, Inc. v. Dep't of Def.*, 87 F.3d 1356, 1359 (D.C. Cir. 1996) (alterations in original) (citations omitted). "We apply the test in keeping with Congress's 'evident intent' . . . 'to make agency action presumptively reviewable,'" and note that "the benefit of any doubt goes to the plaintiff." *Patchak*, 567 U.S. at 225 (quoting *Clarke*, 479 U.S. at 399).

Section 2808's restrictions constrain DoD's ability to fund emergency military construction projects while deferring other military construction projects. The Federal Defendants concede as much, noting that the "limitations in the statute at most reflect constraints on the decision to fund certain projects while deferring others."[6]

---

[6] When considering the analogous role played by Section 8005, Judge N.R. Smith, in dissent, acknowledged that a plaintiff who suffered an economic injury as a result of a statutory diversion of funds would likely have a cause of action to challenge whether the diversion satisfied the terms of the statute. *See Sierra Club v. Trump*, 929 F.3d 670, 715 (9th Cir. 2019) (N.R. Smith, J., dissenting) ("This statute [Section 8005] arguably protects Congress and those who would have been entitled to the funds as originally appropriated; and as a budgetary statute regarding the transfer of funds among DoD accounts, it arguably protects economic interests.").

The States are suitable challengers to enforce Section 2808's limitations because they have asserted such economic interests here and thus they are either the intended beneficiaries of the statute, or at the very least, their interests are unlikely to frustrate the purpose of the statute. Absent the invocation of Section 2808, the States stood to benefit significantly from federal military construction funding. The Federal Defendants diverted funding from 17 separate military construction projects within the borders of the Plaintiff States, totaling over $493 million. According to the States' expert, the diversion of funds "would result in a total of $366 million in total lost business sales within the States for the next three calendar years, 2020-2022," even taking "into consideration the offsetting benefits to the States caused by the $1.0 billion of U.S. funds that would be spent in California and New Mexico to build the proposed border barriers."[7] Moreover, "the gross regional product (GRP) of the States would be reduced by $165 million as a result of this diversion of military funds," and the tax revenues for state and local governments would be reduced by over $36 million. Section 2808's restrictions ensure that, ordinarily, its authority cannot be used to divert funding for military construction projects unless the construction satisfies certain criteria.

---

[7] Excluding California from this analysis, the expert estimates that total would be much greater: the total lost business sales within the remaining states would be $789 million.

Therefore, the States fall within the statute's zone of interests and can enforce its criteria.

Moreover, *Patchak* establishes that when a statute deals with land use, the "neighbors to the use" may sue and their "interests, whether economic, environmental, or aesthetic, come within [the statute's] regulatory ambit." 567 U.S. at 227–28. Here, Section 2808 is a construction statute. It allows the Secretary of Defense to "undertake military construction projects," in "the event of a declaration of war or the declaration by the President of a national emergency." 10 U.S.C. § 2808. Construction of this sort naturally requires land use, and California and New Mexico, as border states immediately adjacent to the border wall construction projects, are quasi-sovereign neighbors to that use and plainly fall within its zone of interests.

Therefore, the States fall within Section 2808's zone of interests and they have a cause of action to challenge the construction.

2

The Supreme Court's decision in *Bond*, and our decisions in *McIntosh* and the prior *Sierra Club* appeal, provide ample support that Sierra Club has a cause

of action under the Appropriations Clause to challenge the Federal Defendants' use of Section 2808 for border wall construction.[8]

"[I]ndividuals, too, are protected by the operations of separation of powers and checks and balances; and they are not disabled from relying on those principles in otherwise justiciable cases and controversies." *Bond v. United States*, 564 U.S. 211, 223 (2011). "[B]oth federalism and separation-of-powers constraints in the Constitution serve to protect individual liberty, and a litigant in a proper case can invoke such constraints '[w]hen government acts in excess of its lawful powers.'" *United States v. McIntosh*, 833 F.3d 1163, 1174 (9th Cir. 2016) (discussing and quoting *Bond*, 564 U.S. at 222). "[The Appropriations Clause] constitutes a separation-of-powers limitation that [litigants] can invoke to challenge" actions that cause justiciable injuries. *Id.* at 1175.

Although the terms of Section 2808 are different from Section 8005, Section 2808's role here is analogous to the role of Section 8005 in the prior appeal: Section 2808 permits DoD to fund construction outside the normal appropriations process, if certain criteria are met, but it operates against the backdrop of the Appropriations Clause. Because, as explained below, we

---

[8] We address only whether Sierra Club has a constitutional cause of action because Sierra Club did not argue in any detail that it has a cause of action under the APA in its opening brief.

47

conclude that the Federal Defendants have not satisfied statute's criteria, any construction undertaken purportedly using its authority violates the explicit prohibition of the Appropriations Clause that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ." U.S. Const. art.1, § 9, cl. 7. Sierra Club has invoked this prohibition.

If the zone of interests test applies at all here, the Appropriations Clause of the Constitution defines the zone of interests because it is the "particular provision of law upon which [Sierra Club] relies" in seeking relief. *Bennett*, 520 U.S. at 175–76. Section 2808 is relevant only because, to the extent it applies, it authorizes executive action that otherwise would be unconstitutional or *ultra vires*. That a statute is relevant does not transform a constitutional claim into a purely statutory one. Sierra Club's cause of action stems from the Federal Defendants' violation of the Appropriations Clause because Sierra Club seeks to enforce the Clause's express prohibition.

To the extent the zone of interests test ever applies to constitutional causes of action, it asks only whether a plaintiff is "arguably within the zone of interests to be protected . . . by the . . . constitutional guarantee in question." *Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 320 n.3 (1977) (quoting *Data Processing Serv.*, 397 U.S. at 153). This renders the test nearly superfluous: so

48

long as a litigant is asserting an injury in fact to his or her constitutional rights, he has a cause of action. *See* ERWIN CHEMERINSKY, FEDERAL JURISDICTION 112 (7th ed. 2016) (citing LAURENCE TRIBE, AMERICAN CONSTITUTIONAL LAW 446 (3d ed. 2000)).

Applying that generous formulation of the test here, Sierra Club falls within the Appropriations Clause's zone of interests. Because the diversion of funds was not authorized by the terms of Section 2808, it is unconstitutional. *See City and Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1233–34 (9th Cir. 2018) ("[W]hen it comes to spending, the President has none of 'his own constitutional powers' to 'rely' upon." (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)). Sierra Club is an organization within the United States that is protected by the Constitution. The unconstitutional transfer of funds here infringed upon Sierra Club's members' liberty interests, harming their environmental, aesthetic, and recreational interests. Thus, Sierra Club falls within the Clause's zone of interests and has a cause of action to challenge the transfers.

V

Next, we consider whether the terms of Section 2808 authorize the challenged border wall construction projects. We conclude that the projects fail to

49

satisfy two of the statutory requirements: they are neither necessary to support the use of the armed forces, nor are they military construction projects. Although the statute supplies other limitations, we do not address them because we conclude that these two limitations are more than sufficient to render the border wall construction projects unlawful.

A

Section 2808 allows the Secretary of Defense to undertake military construction projects in the event of a national emergency requiring the use of the armed forces, but the statute specifies that such projects must be "necessary to support such use of the armed forces." The district court's analysis is persuasive on this issue, and we hold that border wall construction is not necessary to support the use of the armed forces with respect to the national emergency on the southern border. The Federal Defendants have not established that the projects are necessary to support the use of the armed forces because: (1) the administrative record shows that the border wall projects are intended to support and benefit DHS—a civilian agency—rather than the armed forces, and (2) the Federal Defendants have not established, or even alleged, that the projects are, in fact, *necessary* to support the use of the armed forces.

First, the record illustrates that the border wall projects are intended to benefit DHS and its subagencies, CBP and U.S. Border Patrol ("USBP"), not the armed forces. The record demonstrates that DoD primarily considered the many benefits to these civilian agencies in determining that physical barriers are necessary. DoD determined that physical barriers would "[i]mprove CBP's detection, identification, classification, and response capabilities," "[r]educe vulnerabilities in key border areas and the time it takes Border Patrol agents to apprehend illegal migrants," "improv[e] CBP force allocation," "reduce the challenges to CBP," "effectively reduce the enforcement footprint and compress USBP operations to the immediate border area," "serve to channel illegal immigrants towards locations that are operationally advantageous to DHS," "enable CBP agents to focus less on the rugged terrain," and "give a distinct and enduring advantage to USBP as a force multiplier."

To the extent DoD decision-makers believed that construction would benefit DoD at all, the record demonstrates that the construction is merely expected to help DoD *help* DHS. DoD determined that the barriers would serve as "force multipliers," by allowing military personnel to cover other high-traffic border areas without existing barriers, a benefit plainly intended to assist DHS, which, by statute, is tasked with "[s]ecuring the borders, territorial waters, ports,

51

terminals, waterways, and air, land, and sea transportation systems of the United States." 6 U.S.C. § 202. Moreover, border wall construction would "enable more effective and efficient use of DoD personnel, which could ultimately reduce the demand for DoD support at the southern border over time." Thus, the record makes clear that the primary objective of border wall construction is to benefit a civilian agency, DHS, and that the construction strives to ultimately eliminate the need for DoD support to DHS altogether.

Second, the Federal Defendants have not even alleged, let alone established as a matter of fact, that the border wall construction projects are "necessary" under any ordinary understanding of the word. *See* MERRIAM-WEBSTER ONLINE DICTIONARY (defining "necessary" as "absolutely needed: required"); OXFORD ENGLISH DICTIONARY ONLINE (defining "necessary" as "[i]ndispensable, vital, essential"). In assessing the necessity of the border wall construction projects, the Federal Defendants concluded: "In short, these barriers will allow DoD to provide support to DHS more efficiently and effectively. In this respect the contemplated construction projects are force multipliers." Efficiency and efficacy are not synonymous with necessity.

The Federal Defendants contend that "Section 2808's reference to necessity does not entail the stringent level of indispensability," assumed by the district

52

court, and they request that the Court adopt a more relaxed definition of the term here. The Federal Defendants cite *United States v. Comstock*, 560 U.S. 126, 133–34 (2010), for the proposition that the word "necessary" "often means merely" "convenient, or useful," or "conducive." But *Comstock* provides little support for that proposition. The Court in *Comstock* considered what powers were entrusted to Congress by the Necessary and Proper Clause of the United States Constitution. Examining the import of the entire clause, the Court observed that "the Necessary and Proper Clause makes clear that the Constitution's grants of specific federal legislative authority are accompanied by broad power to enact laws that are 'convenient, or useful' or 'conducive' to the authority's 'beneficial exercise.'" *Comstock*, 560 U.S. at 133–34 (quoting *M'Culloch v. Maryland*, 17 U.S. 316, 413, 418 (1819)). The Court noted that in the specific context of the Necessary and Proper Clause, "the word 'necessary' does not mean 'absolutely necessary.'" *Id.* at 134. Contrary to the Federal Defendants' assertion, however, the Court in *Comstock* did not set forth a universal definition of the word "necessary," but instead, one narrowly cabined to its constitutional context. The Federal Defendants provide no reason why we must apply the logic of the Court's approach in that specific context to the military construction authority at issue here.

The Federal Defendants also cite *Commissioner v. Heininger*, 320 U.S. 467, 471 (1943). In *Heininger*, the Court interpreted a Revenue Act provision allowing for the deduction of "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." *Id.* at 468 n.1. There, not only was the word "necessary" coupled with "ordinary," suggesting that a more relaxed definition of "necessary" may be appropriate, but the Court was interpreting the language of a business expense tax deduction provision. Within that context, dealing with a statutory provision intended to foster business development and growth, it makes sense to interpret the term in a more relaxed fashion in furtherance of that purpose. Again, the Federal Defendants provide no explanation why *Heininger*'s logic applies to the very different statutory context at issue in this case.

"Necessary" as it appears in Section 2808 is best understood as retaining its plain meaning, which means, at the very least, "required," or "needed."[9] The fact that border wall construction might make DoD's support more efficient and effective does not rise to the level of "required" or "needed"—and the Federal Defendants have failed to show that it does. That Congress declined to provide more substantial funding for border wall construction and voted twice to terminate the President's declaration of a national emergency underscores that the border wall is not, in fact, required or needed. Thus, the Federal Defendants fail to

---

[9] *Ayestas v. Davis*, 138 S. Ct. 1080, 1093 (2018) is not to the contrary. In *Ayestas*, the Supreme Court interpreted the use of the term "necessary" within the context of 18 U.S.C. § 3599, a statute that "authorizes federal courts to provide funding to a party who is facing the prospect of a death sentence and is 'financially unable to obtain adequate representation or . . . other *reasonably necessary* services.'" *Ayestas*, 138 S. Ct. at 1092 (emphasis added). The Court acknowledged that "necessary" may have one of two meanings: either "essential" or "something less than essential." *Id.* at 1093. It concluded that "necessary" carried the latter meaning in Section 3599 because it would "make[] little sense to refer to something as being 'reasonably essential.'" *Id.* In other words, the Court's interpretation hinged on the fact Section 3599 did not merely use the standalone term "necessary," but used the phrase "reasonably necessary." Thus, here, where "necessary" is a part of no such statutory phrase, it makes little sense to follow the Court's approach in *Ayestas*. Moreover, Section 3599's statutory context—the provision of funding to ensure the adequate defense of individuals facing the prospect of a death penalty—additionally supports the sensibility of a more flexible definition to serve that statutory purpose. That context is unrelated to emergency military construction authority, however, and so *Ayestas* does not alter our decision to adopt the plain meaning of "necessary" here.

55

satisfy the statutory requirement that the construction projects be "necessary to support the use of such armed forces."

The remainder of the Federal Defendants' arguments do not compel an opposite conclusion. First, the Federal Defendants assert that the determination of whether military construction is necessary to support the use of the armed forces is "committed to the discretion of the Secretary of Defense by law." They argue that questions of military necessity turn on "a complicated balancing of a number of factors which are peculiarly within [the Secretary's] expertise" and that the Court should defer to such expertise. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

"[T]he claim of military necessity will not, without more, shield governmental operations from judicial review." *Koohi v. United States*, 976 F.2d 1328, 1331 (9th Cir. 1992). A decision is generally committed to an agency decision by law only when a court would have "no meaningful standard against which to judge the agency's exercise of discretion." *Perez Perez v. Wolf*, 943 F.3d 853, 860 (9th Cir. 2019) (quoting *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 719 (9th Cir. 2011)).

As we have explained, the Federal Defendants have simply claimed "military necessity" without more, and this alone cannot shield their actions from

judicial review.  Further, as we have noted, the judgment at issue here is not a military one.  The border wall construction projects further the goals of DHS—a civilian law enforcement agency—and the determination that the projects are necessary, in any sense, is a law enforcement calculation, not a military one.  Such determinations involve distinctly different calculations than those present in the military deference cases cited by the Federal Defendants, like *Gilligan v. Morgan*, which involved the ongoing judicial oversight of the Ohio National Guard.  *See Gilligan v. Morgan*, 413 U.S. 1, 6 (1973) (considering whether the district court should "assume and exercise a continuing judicial surveillance over the Guard to assure compliance with whatever training and operations procedures may be approved by [the] court.").  The determinations at issue here, while important, are lawmaking decisions that are "a job for the Nation's lawmakers, not for its military authorities."  *Youngstown*, 343 U.S. at 587.  Thus, the Federal Defendants cannot evade judicial review of these determinations by simply labeling them "military" ones.

What is more, nothing in the language of the statute suggests that this determination is committed to the discretion of the Secretary of Defense.  Here, the phrase "that are necessary to support such use of the armed forces," provides standards against which to judge that exercise of discretion; as demonstrated

57

above, the statutory language is susceptible to basic statutory interpretation. If Congress had committed these issues to the unfettered discretion of the Secretary, we would—of course—defer. But it did not, so it is our task to determine whether the Secretary has complied with the statutory requirements.

Further, judicial review of statutes conferring specific emergency powers to the President is critical because, as explained by the Senate Committee on Government Operations in passing the NEA, the NEA left "the definition of when a President is authorized to declare a national emergency . . . to the various statutes which give him extraordinary powers." *NEA Source Book* at 292. Therefore, the President's emergency authority is conferred only by statute. Were we to conclude that judicial review of such a statute was precluded, the President's emergency authority would be effectively unbounded, contravening the purpose of the NEA. Thus, the language of Section 2808 is not only susceptible to judicial review, but its statutory context requires it.

Alternatively, the Federal Defendants assert that "[e]ven if the Secretary's military-necessity determinations were reviewable, this Court . . . should defer to the Secretary's conclusion that the challenged projects are necessary to improve the effectiveness and efficiency of DoD personnel deployed to the border." But, as we have discussed, it does not follow from the idea that a project is designed to

improve effectiveness and efficiency that a project is necessary in any ordinary sense. And absent from the record is any determination by the Secretary that the projects are actually necessary. Under these circumstances, deference, in the classic administrative law sense, is not appropriate.

In sum, based on the record, we conclude that the construction of the challenged border wall projects does not comply with the statutory requirements of Section 2808. Therefore, because the Federal Defendants' construction exceeds the authority provided by Section 2808 and is unlawful, and we affirm the declaratory judgment of the district court.

B

Section 2808 permits the Secretary of Defense to "undertake military construction projects." Section 2801 defines the term "military construction" "as used in this chapter or any other provision of law" as "any construction, development, conversion, or extension of any kind carried out with respect to a military installation, whether to satisfy temporary or permanent requirements, or any acquisition of land or construction of a defense access road." 10 U.S.C. § 2801(a). It further defines "military installation" as "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department." *Id.* at § 2801(c)(4).

59

Because the border wall construction projects plainly qualify as "construction," the key inquiry here is whether they are being "carried out with respect to a military installation." "Interpretation of a statute must begin with the statute's language." *Rumsey Indian Rancheria of Wintun Indians v. Wilson*, 64 F.3d 1250, 1257 (9th Cir. 1994) (citations omitted). "[S]tatutory language must always be read in its proper context," and courts must look to the "design of the statute as a whole and to its object and policy," *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1026 (9th Cir. 2013) (quotations omitted), for "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme," *Home Depot U.S.A., Inc. v. Jackson*, 139 S. Ct. 1743, 1748 (2019).

The Federal Defendants make two separate arguments that border wall construction satisfies the requirements of Section 2808 based on one key fact: the land on which the projects would be built has been brought under military jurisdiction and assigned to a military installation—Fort Bliss in El Paso, Texas. First, the Federal Defendants argue that the individual border wall construction projects are actually one and the same as Fort Bliss because according to the Assistant Secretary of the Army, Alex A. Beehler, when a "site is assigned to a military installation for real property accountability purposes," it "is considered to

be part of that installation, even if remotely located from the Army Garrison [of that installation]." Alternatively, they argue that because the projects have been brought under military jurisdiction, the construction projects are "other activity under the jurisdiction of the Secretary of a military department." 10 U.S.C. § 2801.

We must, then, determine (1) whether administratively assigning the projects to Fort Bliss renders them one and the same as Fort Bliss for purposes of the statute, and if not, (2) whether bringing land under military jurisdiction for real property accountability purposes renders the border wall "other activity under the jurisdiction of the Secretary of a military department."

We hold that, for purposes of the emergency construction authority provided by Section 2808, the border wall construction projects are distinct from Fort Bliss itself, and that the border wall construction projects at issue here do not satisfy the meaning of "other activity."[10]

---

[10] The Plaintiffs do not challenge that the projects on the Goldwater Range satisfy the definition of "military construction," and we do not consider this issue; therefore, our holding is limited only to the remaining nine construction projects. Our determination that the funding of the projects is not necessary to support the use of the armed forces is sufficient to hold all eleven projects unlawful.

Although the border wall construction projects may be considered part of Fort Bliss for purposes of real property accounting, we find that a number of reasons support that the projects should not be considered a part of Fort Bliss for purposes of Section 2808.

First, we state the most obvious reason why the border wall construction projects need not be considered a part of Fort Bliss in this context. To begin, the projects are not physically connected to Fort Bliss—on their face, they are not "part" of that military installation. In fact, most projects are hundreds of miles away from Fort Bliss.

Moreover, the projects are not functionally part of Fort Bliss. The Federal Defendants cite no operational ties between the projects and any of the military activities conducted at Fort Bliss. This is contrary to other examples of sites which are geographically separate from the military installation to which they have been assigned. For example, the Federal Defendants highlight that the Green River Test Complex site in Utah is considered part of the White Sands Missile Range in New Mexico, even though the two are in different states and located hundreds of miles apart. But these sites share a close functional connection. Throughout the 1960s, the military tested Athena missiles by launching them from

the Green River Test Complex to detonate on the White Sands Missile Range. No such functional nexus exists, or has even been alleged, here. Although a functional nexus may not be required for administrative assignment, it matters for purposes of Section 2808.

Additionally, the Federal Defendants cite no other purpose underlying the administrative assignment, besides pure administrative convenience, that compels the conclusion that the projects should be considered part of Fort Bliss for purposes of Section 2808. The Federal Defendants state that the projects were assigned to Fort Bliss "because it is the largest, most capable active Army installation in the vicinity of the southern border"; it "has a sizable existing installation management office"; it has "experience working with the U.S. Army Corps of Engineers on military construction projects"; "it is more efficient for command of all the real property associated with the projects undertaken pursuant to § 2808 to be vested in one Army installation"; and it has an "existing support relationship with the U.S. Border Patrol." While these are, of course, practical reasons for administratively assigning the land to Fort Bliss, they convey no underlying purpose more significant than administrative convenience. They signify no reason why the border wall construction projects must be considered part of Fort Bliss for any reason beyond administrative assignment.

63

Further, reading the words of Section 2808 "in their context and with a view to their place in the overall statutory scheme," it would make little sense to equate the requirements of Section 2808 with the administrative assignment process in order to conclude that the projects are a part of Fort Bliss. *Home Depot U.S.A., Inc.*, 139 S. Ct. at 1748. The text of Section 2808 supplies boundaries for the authority provided—such as, that construction be conducted with respect to a military installation, meaning a base, camp, station, yard, center, or other activity under military jurisdiction. By contrast, there appear to be no boundaries whatsoever restricting when the government can administratively assign a geographically distant site to a military installation. The Federal Defendants even specify that "[t]here is no legal, regulatory, or policy requirement [that] geographically separate sites . . . be assigned to a 'nearby' military installation," nor a requirement that the "sites or lands that comprise a given military installation . . . be located in the same State or within a certain distance of other sites associated with the military installation." And a site may exist as "land only, where there are no facilities present," "facility or facilities only, where the underlying land is neither owned nor controlled by the government," or "land and facilities thereon." To construe the limited text of Section 2808 to incorporate a wholly unlimited process would be contrary to its structure and context.

64

Moreover, to construe the statute so broadly would also be contrary to the purpose of the statutory scheme of which Section 2808 is a part—the NEA. *See Brooks v. Donovan*, 699 F.2d 1010, 1011 (9th Cir. 1983) (rejecting a literal interpretation that "would thwart the purpose of the over-all statutory scheme or lead to an absurd result" (quotations and citations omitted)); *see generally NEA Source Book* at 50. Because "[t]he National Emergencies Act is not intended to enlarge or add to Executive power," it would make little sense to interpret the constrained definition of "military installation" supplied by Section 2808 to encompass a process with no limitations whatsoever. *NEA Source Book* at 292. This would undoubtedly have the effect of enlarging the President's emergency powers because it would allow a less stringent Executive Branch administrative process to circumvent the limits of the statutory authority. This would allow the Executive Branch to undertake any construction project it wants by merely assigning any piece of land to a military installation, thus permitting more construction than authorized by the statute and granting the President more emergency authority.

2

The Federal Defendants' second argument fails for similar reasons. To hold that the border wall construction projects constitute "other activity" under military

65

jurisdiction would transform the definition of "military installation" to include not just "other activity," but "any activity" under military jurisdiction, contradicting the text of the statute. The terms "base, camp, post, station, yard, [or] center" supply meaning and provide boundaries to the term "other activity," and they are not mere surplusage. *See Yates v. United States*, 135 S. Ct. 1074, 1087 (2015) ("Had Congress intended 'tangible object' in § 1519 to be interpreted so generically as to capture physical objects as dissimilar as documents and fish, Congress would have had no reason to refer specifically to 'record' or 'document.' The Government's unbounded reading of 'tangible object' would render those words misleading surplusage."). The Federal Defendants do not explain how the border wall construction projects are similar to bases, camps, posts, stations, yards, or centers, and we find that they are not. The failure to illustrate a connection between the border wall projects and the other statutory examples is sufficient to reject this argument because we avoid construing statutes to allow one general word to render specific words meaningless. *See CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 295 (2011) ("We typically use *ejusdem generis* to ensure that a general word will not render specific words meaningless.").

The Federal Defendants cite *United States v. Apel*, 571 U.S. 359, 368 (2014) to support their position, but this case has limited applicability here, and does not

support that "other activities" under military jurisdiction means "any activity" under military jurisdiction. There, the Supreme Court analyzed a different statute, which imposed a criminal fine on anyone who reentered a "military, naval, or Coast Guard reservation, post, fort, arsenal, yard, station, or installation" after being removed from such a location. *See* 18 U.S.C. § 1382. The Federal Defendants argue that *Apel* supports their position because in interpreting the definition of "military installation," the Court explained that "'military duty' and 'military protection' are synonymous with the exercise of *military jurisdiction*," and it cited 10 U.S.C. § 2801 as an example of a statute defining "military installation" as a "base . . . or other activity under the jurisdiction of the Secretary of a military department." *Apel*, 571 U.S. at 368. But this point does not go to the key issue here—Plaintiffs do not contest that the sites are under military jurisdiction, but rather, whether they fall within the parameters of "other activity" under military jurisdiction, as limited by the other examples provided. In any event, *Apel* did not analyze Section 2801 itself. The context of a criminal trespass statute, is, of course, different than the context of emergency construction authority, and because "[s]tatutory language must always be read in its proper context," it is not clear why *Apel*'s definition should apply here. *UMG Recordings, Inc.*, 718 F.3d at 1026.

67

If anything, *Apel* provides support for our reasoning with respect to the Federal Defendants' first argument. *Apel* undermines the notion that the use, possession, or control of land—such as through the process of administrative assignment—is central to the inquiry of what constitutes a military installation. *Apel*, 571 U.S. at 368. Instead, *Apel* emphasizes that in determining what constitutes a military installation, an area's connection to military functions plays a significant role. *Apel* cites *United States v. Phisterer*, 94 U.S. 219, 222 (1877), explaining that "there we interpreted 'military station' to mean 'a place where troops are assembled, where military stores, animate or inanimate, are kept or distributed, where military duty is performed or military protection afforded,—where something, in short, more or less closely connected with arms or war is kept or is to be done,'" which it reasoned, if anything, "confirms our conclusion that § 1382 does not require exclusive use, possession, or control." *Id.* (internal quotations and citations omitted). Thus, *Apel* provides little assistance to the Federal Defendants, and if anything, bolsters the Plaintiffs' interpretation of the statute.

Second, as the district court explained, the Federal Defendants' interpretation of "other activities" would grant them "essentially boundless authority to reallocate military construction funds to build anything they want,

anywhere they want, provided they first obtain jurisdiction over the land where the construction will occur." These arguments are closely related to those outlined in the previous section, and as explained there, no restrictions constrain when land can be brought under military jurisdiction. *See* Section V.B.1. Although the Federal Defendants assert that "the government does not contend that the entire 'Southern border' is a military installation," the Federal Defendants cite no limit to their interpretation that would prevent them from making it one. This means that, if we were to adopt their interpretation of "other activity," and, as the district court explained, "provided [they] complete the right paperwork," the Federal Defendants would be free to divert billions of dollars from projects funded by congressional appropriations to projects of their own choosing. As demonstrated by this case, this would allow the Federal Defendants to redirect funds at will without regard for the normal appropriations process. Ordinarily, we reject interpretations with "unnecessarily expansive result[s], absent more explicit guidance or indication from Congress," and instead, adopt more "rational" or "natural" readings. *Ariz. State Bd. for Charter Sch. v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1008–09 (9th Cir. 2006). For this reason, where there is no guidance or indication from Congress that such an expansive interpretation is favored, and particularly where doing so

would produce a result contrary to the express will of Congress, it is untenable for us to adopt such an interpretation.

Finally, to interpret "other activities" so broadly would run afoul of the constitutional separation of powers, which provide Congress with exclusive control over appropriations, and of the NEA, which was passed to "[e]nsure that the powers now in the hands of the Executive will be utilized only in time of genuine emergency and then only under safeguards providing for Congressional review." *NEA Source Book* at 50. Particularly in the context of this case, where Congress declined to fund the very projects at issue and attempted to terminate the declaration of a national emergency (twice), we cannot interpret the statute to give the Executive Branch unfettered discretion to divert funds to any land it deems under military jurisdiction.[11] "Presidential powers are not fixed but fluctuate, depending on their disjunction or conjunction with those of Congress," and "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb." *Youngstown*, 343 U.S. at 635, 637 (Jackson, J., concurring). Here, though imperfectly, Congress has made clear that it does not support extensive border wall construction. The Federal

---

[11] We do not express a view with respect to whether this is a "real" national emergency, but instead, we merely construe the statute narrowly in light of Congress's determinations on the matter.

70

Defendants' actions to the contrary are incompatible with this position, and therefore, the existing statutory authority provided by Section 2808 must be construed narrowly.[12]  We cannot, and do not, accept the Federal Defendants' boundless interpretation of what constitutes a "military installation."

Therefore, we conclude that Section 2808 does not authorize the eleven border wall construction projects.

VI

The district court held that Sierra Club was entitled to a permanent injunction enjoining the Federal Defendants "from using military construction funds appropriated for other purposes to build a border wall in the" project areas challenged in this appeal.  We review a district court's grant of injunctive relief for abuse of discretion.  *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

A permanent injunction is appropriate when: (1) a plaintiff will "suffer[] an irreparable injury" absent injunction, (2) available remedies at law are "inadequate,"[13] (3) the "balance of hardships" between the parties supports an equitable remedy, and (4) the public interest is "not disserved."  *Id.*  When the

---

[12] *See* Kristen Eichensehr, *The* Youngstown *Canon: Vetoed Bills and the Separation of Powers*, 70 DUKE L.J. __ (forthcoming 2021), available at SSRN: https://ssrn.com/abstract=3680748.

[13] The parties do not contest this element, and we do not address it here.

government is party to a case, the balance of equities and public interest factors merge. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

The district court properly considered each of these elements. It held that Sierra Club suffered irreparable injury because the Federal Defendants' conduct "will impede [Sierra Club's members'] ability to enjoy, work, and [re]create in the wilderness areas they have used for years along the U.S.-Mexico border," and that the organizations themselves had suffered irreparable harm as a result of the Federal Defendants' conduct, because they "have spent resources creating new education, outreach, and monitoring programs related to the construction projects, rather than on other activities related to their respective missions." In part, because the Federal Defendants "have not pointed to any factual developments that were not before Congress and that may have altered its judgment" to appropriate border wall funding, the district court took the position that the public interest was best served by "ensuring that the statutes enacted by . . . representatives are not imperiled by executive fiat," "by respecting the Constitution's assignment of the power of the purse to Congress," and "by deferring to Congress's understanding of the public interest as reflected in its repeated denial of more funding for border barrier construction." The district court's analysis is reasonable and does not indicate that it abused its discretion.

72

The Federal Defendants' arguments to the contrary are unavailing. They contend that the district court abused its discretion because, in staying the permanent injunction with respect to the Section 8005 case, the Supreme Court "necessarily determined that the harm to the federal government from an injunction prohibiting border-barrier construction outweighs those interests." The Federal Defendants do not expand upon this point, and the Supreme Court's stay order does not address the appropriateness of injunctive relief. If anything, the order alludes only to the merits of Sierra Club's cause of action arguments; it contains nowhere a suggestion that the district court abused its discretion in balancing the equities and weighing the public interest. *See Trump v. Sierra Club*, 140 S. Ct. 1 (2019) (mem.) (stating only that "[a]mong the reasons is that the Government has made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005."). We cannot read into the order more than its text supports.

The Federal Defendants, as they did in the prior appeal, also argue that *Winter v. NRDC, Inc.*, 555 U.S. 7, 32 (2008), requires that the balance of the equities favors the government when the public interest in national defense is weighed against a plaintiff's ecological, scientific, and recreational interests. Their argument is not compelling here for the same reasons it was not there. *See Sierra*

*Club v. Trump*, 963 F.3d 874, 895–97 (9th Cir. 2020), *petition for cert. filed*, (U.S. Aug. 7, 2020) (No. 20-138). Even if the government has a "compelling interest[]  in safety and in the integrity of [its] borders," *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 672 (1989), "it cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (citing *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983) ("[T]he INS cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations.")). The fact an important interest is at stake does not permit the government to use unlawful means to further that end. This is evidenced by the *Winter* injunction which enjoined conduct otherwise permitted by law. *Winter*, 555 U.S. at 18–19.

*Winter* is further distinguishable because the public interest there balanced "mission-critical," *id.* at 14, technology used for the Pacific Fleet's "top war-fighting priority," *id.* at 12, against possible "harm to an unknown number of marine mammals," *id.* at 26. By contrast, the Federal Defendants here have cited no such critical interest at stake, and the permanent environmental and economic harms to the Plaintiffs are far more serious and far less speculative than those alleged in *Winter*.

Finally, the Federal Defendants challenge the district court's reasoning that "by enacting the Consolidated Appropriations Act, *Congress* had already balanced the equities in plaintiffs' favor" because "the CAA did *not* prohibit DoD from relying on separate and preexisting statutory authorities to spend its own previously appropriated funds on border barriers." This argument is unavailing because the budgetary standoff, government shutdown, and the resulting 2019 CAA clearly indicate that Congress determined that the interests of the entire country did not favor funding more expansive border wall construction. While this determination might be broader than the balance of equities between the parties here, it certainly incorporates them, and the district court did not abuse its discretion by giving weight to Congress's judgment in its own analysis.

We therefore affirm the permanent injunction granted to Sierra Club. Given that we have resolved the merits of this appeal, the district court's stay pending appeal is terminated, and we dismiss Sierra Club's emergency motion to lift the stay pending appeal as moot.

## VII

The district court denied the States' request for a separate permanent injunction enjoining the Federal Defendants' use of Section 2808 for border wall construction as duplicative and moot. This Court reviews a district court's denial

of injunctive relief for an abuse of discretion. *eBay Inc.*, 547 U.S. at 391. "An abuse of discretion is a plain error, discretion exercised to an end not justified by the evidence, a judgment that is clearly against the logic and effect of the facts as are found." *Rabkin v. Or. Health Sci. Univ.*, 350 F.3d 967, 977 (9th Cir. 2003) (citations and quotations omitted).

The district court did not abuse its discretion. It held that "[b]ecause . . . the Court finds that Sierra Club Plaintiffs have established that a permanent injunction is warranted as to all eleven proposed projects, the Court denies State Plaintiffs' duplicative request for a permanent injunction as moot." Injunctive relief is an equitable remedy, and "an award of an injunction is something that a plaintiff is generally not entitled to as a matter of right." 42 Am. Jur. 2d *Injunctions* § 14 (2020). "Even if facts justifying an injunction . . . have been proven, a court must still exercise its discretion to decide whether to grant an injunction." *Id.* Here the district court did not abuse this discretion because it granted Sierra Club a permanent injunction enjoining the construction of the same border wall projects challenged by the States. Although it subsequently stayed that injunction, it did so because of a Supreme Court stay imposed in a prior appeal which was based on, conceivably, a similar legal issue. Therefore, though we might weigh the

considerations present in this case differently, we hold that the district court did not abuse its discretion in denying the States injunctive relief.

## VIII

Although we recognize that in times of national emergency we generally owe great deference to the decisions of the Executive, the particular circumstances of this case require us to take seriously the limitations of the text of Section 2808 and to hold the Executive to them. The "power to legislate for emergencies belongs in the hands of Congress." *Youngstown*, 343 U.S. at 654 (Jackson, J., concurring). We cannot "keep power in the hands of Congress if it is not wise and timely in meeting its problems," *id.*, but where, as here, Congress has clung to this power with both hands—by withholding funding for border wall construction at great effort and cost and by attempting to terminate the existence of a national emergency on the southern border on two separate occasions, with a majority vote by both houses—we can neither pry it from Congress's grasp. For all "its defects, delays and inconveniences," it remains critical in all areas, but particularly with respect to the emergency powers, that "the Executive be under the law, and that the law be made by parliamentary deliberations." *Id.* at 655. We reject Justice Jackson's contention that "[s]uch institutions may be destined to pass away," *id.*, particularly given the actions of Congress as relate to this case. We agree,

however, that it must always be "the duty of the Court to be last, not first, to give them up." *Id.*

We affirm the judgment of the district court. We hold that the States and Sierra Club both have Article III standing and a cause of action to challenge the Federal Defendants' border wall construction projects, that Section 2808 did not authorize the challenged construction, and that the district court did not abuse its discretion in either granting a permanent injunction to Sierra Club or in denying a separate permanent injunction to the States.[14]

**AFFIRMED.**

---

[14] Because we conclude that the projects are unlawful because they are not authorized by Section 2808, we do not reach Plaintiffs' arguments with respect to Section 739 of the 2019 CAA.

*Sierra Club, et al. v. Trump, et al.*, No. 19-17501; *State of California, et al. v. Trump, et al.*, Nos. 19-17502 & 20-15044

COLLINS, Circuit Judge, dissenting:

We once again consider challenges to the Department of Defense's construction of border barriers and related infrastructure along our southern border. *See Sierra Club v. Trump*, 963 F.3d 874 (9th Cir. 2020); *California v. Trump*, 963 F.3d 926 (9th Cir. 2020). In this second round of appeals from the same underlying lawsuits, the Government appeals the district court's grant of declaratory and permanent injunctive relief barring the use of "military construction funds appropriated for other purposes to build a border wall" in 11 specified project areas. Two distinct groups of litigants constitute the Plaintiffs in these appeals (collectively, "Plaintiffs"): (1) the Sierra Club and the Southern Border Communities Coalition ("SBCC") (collectively, the "Organizations") and (2) nine states led by California and New Mexico (collectively, the "States").[1] In the partial judgments under review, the district court granted summary judgment and declaratory relief to the Plaintiffs, concluding that the emergency military construction authority granted by 10 U.S.C. § 2808 did not authorize the challenged use of funds. However, the district court granted permanent injunctive

---

[1] The nine States are California, New Mexico, Colorado, Hawaii, Maryland, New York, Oregon, Virginia, and Wisconsin. California and New Mexico had likewise taken the lead in the prior appeals.

relief only to the Organizations and denied the States' request for such relief.

The majority concludes that both the Organizations and the States have Article III standing; that the States have a cause of action to challenge the construction projects under the Administrative Procedure Act ("APA") and that the Organizations have a cause of action under the Appropriations Clause of the Constitution; that the construction projects are unlawful; and that the district court properly determined that the Organizations are entitled to declaratory and injunctive relief while the States are entitled to only declaratory relief. I agree that at least the Sierra Club, California, and New Mexico have established Article III standing, and I conclude that they have a cause of action to challenge the construction projects under the APA. But in my view the construction projects are lawful. Accordingly, I would reverse the district court's partial judgments and remand for entry of partial summary judgment in favor of the Defendants. I respectfully dissent.

## I

Although these appeals arise from the same underlying lawsuits as the prior appeals, the particular dispute at issue here involves a different statutory framework and a distinct procedural history. Before turning to the merits, I will briefly review both that framework and that history.

2

**A**

Under the National Emergencies Act, 50 U.S.C. § 1601 *et seq*., the President may formally declare a "national emergency," thereby triggering the potential exercise of emergency powers set forth in various other statutes. *See* 50 U.S.C. § 1621(a). Among those emergency powers is the authority to "undertake military construction projects," but that authority may be invoked only if the President specifically declares a national emergency "that requires use of the armed forces." 10 U.S.C. § 2808(a). On February 15, 2019, the President did just that, "declar[ing] that a national emergency exists at the southern border of the United States" and "that this emergency requires use of the Armed Forces." *See* Proclamation No. 9844, 84 Fed. Reg. 4949, 4949 (Feb. 20, 2019). As the President's Proclamation explained, the Department of Defense ("DoD") was already providing "support and resources" to the Department of Homeland Security ("DHS") "at the southern border," and "additional support," including military personnel and logistical support, was necessary "to address the crisis." *Id*.

In light of this declaration, the Secretary of Defense was authorized to "undertake military construction projects . . . not otherwise authorized by law that are necessary to support such use of the armed forces." 10 U.S.C. § 2808(a). On September 3, 2019, the Secretary of Defense issued a memorandum expressly invoking that authority in deciding to undertake 11 specified "border barrier

3

military construction projects." "Based on analysis and advice from the Chairman of the Joint Chiefs of Staff and input from the Commander, U.S. Army Corps of Engineers, the Department of Homeland Security (DHS), and the Department of the Interior," the Secretary determined that these "11 military construction projects along the international border with Mexico, with an estimated total cost of $3.6 billion, are necessary to support the use of the armed forces in connection with the national emergency." The Secretary stated that, because "[t]hese projects will deter illegal entry, increase the vanishing time of those illegally crossing the border, and channel migrants to ports of entry," the projects would support the use of the armed forces by "reduc[ing] the demand for DoD personnel and assets at the locations where the barriers are constructed and allow[ing] the redeployment of DoD personnel and assets to other high-traffic areas on the border without barriers." "In this respect," the Secretary explained, "the contemplated construction projects are force multipliers."

Section 2808 further provides that the Secretary may undertake emergency military construction projects "without regard to any other provision of law." 10 U.S.C. § 2808(a). Accordingly, the Secretary's memorandum included the additional directive that the Acting Secretary of the Army was to "expeditiously" undertake the 11 projects "without regard to any other provision of law that could impede such expeditious construction in response to the national emergency,"

4

including "the National Environmental Policy Act, the Endangered Species Act, . . . [and] the Clean Water Act."

The 11 projects authorized by the Secretary contemplated a total of 175 miles of border-barrier construction. They include two projects on the Barry M. Goldwater Range (a military installation in Arizona), seven projects on federal public-domain land, and two projects on non-public land that would need to be acquired through either purchase or condemnation. Because the latter nine projects, unlike the first two, were to be on land that was not then within any military installation, the Secretary's memorandum ordered the Department of the Army to "add such land to the Department of the Army's real property inventory, either as a new installation or as part of an existing military installation." The Army subsequently designated the land for the latter nine projects as under the jurisdiction of the U.S. Army Garrison Fort Bliss, which is in Texas.

Section 2808(a) further provides that emergency military construction "may be undertaken only within the total amount of funds that have been appropriated for military construction, including funds appropriated for family housing, that have not been obligated." 10 U.S.C. § 2808(a). Moreover, when the emergency military construction authority is invoked, the Secretary must notify the appropriate congressional committees of "the decision and of the estimated cost of the construction projects." *Id*. § 2808(b). In providing that notice, the Secretary

5

stated that the "estimated total cost" of the 11 projects was $3.6 billion. The Secretary further stated that the necessary funds would be obtained by deferring "military construction projects that are not scheduled for award until fiscal year 2020 or later," and that the first $1.8 billion of funding would come from the deferral of certain projects "outside of the United States." Only after that would funds be obtained by deferring other construction projects within the United States. In an additional memorandum to other DoD officials, the Secretary identified the 128 specific projects that were slated to be deferred. Forty-three of those projects were located in U.S. States, 21 in U.S. territories, and 64 were overseas. Of the 43 deferred projects in U.S. States, 19 of them were located in the nine States that are parties to this appeal.[2]

**B**

After the President's emergency declaration, but before DoD formally invoked its emergency military construction authority, the Organizations filed an action in the district court against the Acting Defense Secretary, DoD, and a

---

[2] On April 29, 2020, Defendants "provided[d] notice [to the district court] of recent changes to the funding sources for the eleven border barrier military construction projects the Secretary of Defense decided to undertake on September 3, 2019, pursuant to 10 U.S.C. § 2808." Specifically, on April 27, 2020, the Secretary of Defense authorized adjustments to the funding of the projects. Twenty-two projects located in U.S. States were removed from the deferred projects list, and substitute funds were to be drawn from other sources. In light of these funding changes, DoD is no longer deferring projects in Colorado, Hawaii, and New York.

6

variety of other federal officers and agencies. In their March 18, 2019 First Amended Complaint, they sought to challenge, *inter alia*, any projects undertaken by the Secretary under § 2808. California and New Mexico, joined by several other States, filed a similar action, and their March 13, 2019 First Amended Complaint also sought to challenge any such projects. The Plaintiffs' respective complaints also separately challenged certain *other* border-barrier projects undertaken with funds derived from DoD's transfers of funds pursuant to §§ 8005 and 9002 of the Department of Defense Appropriations Act, 2019 ("DoD Appropriations Act"), Pub. L. No. 115-245, Div. A, 132 Stat. 2981, 2999, 3042 (2018). The litigation of those distinct challenges proceeded (resulting in the opinions we issued in the prior appeals), but the parties agreed to stay the summary judgment briefing schedule as to any claims involving § 2808 until the Secretary of Defense made a final decision as to the use of § 2808 to undertake military construction projects.

After the Secretary of Defense reached that final decision on September 3, 2019, as explained above, the parties filed cross-motions for summary judgment. On October 11, 2019, the Organizations moved for partial summary judgment on the ground that DoD's invocation of § 2808 was unlawful, and the Organizations requested declaratory relief and a permanent injunction against the use of § 2808 to carry out the 11 construction projects. The States filed a comparable summary

judgment motion that same day. Although that motion sought injunctive and declaratory relief against any deferral of funding for projects in the nine States, it only sought direct relief against the border-wall construction itself with respect to the subset of seven construction projects that were to be undertaken in California and New Mexico. Defendants filed cross-motions for summary judgment on the legality of DoD's construction efforts under § 2808 with respect to the corresponding projects at issue in each case.

On December 11, 2019, the district court granted partial summary judgment and declaratory relief to both the Organizations and the States, concluding that DoD's construction efforts under § 2808 were unlawful. The court granted permanent injunctive relief to the Organizations against all 11 projects, and in light of this grant of injunctive relief, it denied the States' "duplicative request for a permanent injunction as moot." The district court denied Defendants' cross-motions for summary judgment in both cases. The district court stated, however, that it construed "the Supreme Court's stay of this Court's prior injunction order"—which was the subject of the prior appeals—as "reflect[ing] the conclusion of a majority of that Court that the challenged construction should be permitted to proceed pending resolution of the merits," and the district court therefore *sua sponte* stayed the permanent injunction pending appeal pursuant to Federal Rule of Civil Procedure 62(c). Invoking its authority under Federal Rule

8

of Civil Procedure 54(b), the district court entered partial judgments in favor of both the Organizations and the States.

## II

The Government has not contested the Article III standing of the Plaintiffs in its merits briefs on appeal, but as the majority notes, "we have 'an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties.'" *See* Maj. Opin. at 14 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)). As "an indispensable part of the plaintiff's case, each element" of Article III standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife* (*Lujan v. Defenders*), 504 U.S. 555, 561 (1992). Thus, although well-pleaded allegations are enough at the motion-to-dismiss stage, they are insufficient to establish standing at the summary-judgment stage. *Id.* "In response to a summary judgment motion, . . . the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Id.* (simplified). In reviewing standing *sua sponte* in the context of cross-motions for summary judgment, it is appropriate to apply the more lenient standard that takes the plaintiffs' evidence as true and then asks whether a reasonable trier

9

of fact could find Article III standing. *Lujan v. Defenders*, 504 U.S. at 563 (applying this standard in evaluating whether Government's cross-motion for summary judgment should have been granted); *see also California v. Trump*, 963 F.3d at 954 (Collins, J., dissenting).

In their briefs below concerning the parties' cross-motions, the Plaintiffs asserted a variety of theories as to why they have standing. The Sierra Club and SBCC each asserted that Defendants' allegedly unlawful conduct would cause harm to their members' recreational, aesthetic, and environmental interests. California and New Mexico asserted that Defendants' allegedly unlawful construction activities within their borders would cause both harm to the States' sovereign interests in enforcing their environmental laws as well as actual environmental harm to animals and plants within the States. And all the States, except California, asserted that Defendants' deferral of funding for military construction projects located in those States would cause financial harm to the States in the form of a loss of economic activity and tax revenues. Accepting the Plaintiffs' evidence as true, and drawing all reasonable inferences in their favor, a reasonable trier of fact could conclude that at least the Sierra Club has standing in the Organizations' suit and that at least California and New Mexico have standing in the States' suit.[3]

---

[3] None of the Plaintiffs addressed Article III standing when they moved for partial

10

## A

The Sierra Club has presented sufficient evidence to demonstrate that it has associational standing under *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333 (1977).  Under the *Hunt* test, an association has standing if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id*. at 343.  The Sierra Club has presented sufficient evidence as to each of these three requirements.

To establish that its members would suffer irreparable harm absent a permanent injunction, the Sierra Club presented declarations from members who regularly visit each of the 11 respective project areas.  These members described how the construction and the resulting border barriers would interfere with their enjoyment of the surrounding landscape and would impede their ability to camp, to hike, to hunt, to monitor wildlife, and to participate in other related activities near the project sites.  These injuries to the members' recreational, aesthetic, and environmental interests are sufficient to constitute an injury in fact for Article III

---

summary judgment, nor did the district court address Article III standing in its ruling.  However, Plaintiffs' evidentiary showing of injury in support of a permanent injunction provides a sufficient basis for evaluating their Article III standing.  *See California v. Trump*, 963 F.3d at 954 n.4 (Collins, J., dissenting).

11

purposes. *See Lujan v. Defenders*, 504 U.S. at 562–63 ("Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing."). Moreover, these injuries are fairly traceable to the construction, and an injunction blocking military construction funds appropriated for other purposes from being used to build border barriers in the 11 project areas would redress those injuries by effectively stopping the construction. *See id*. at 560–61. This evidence is therefore sufficient to establish that these members would have Article III standing to sue in their own right.

The other *Hunt* requirements are also satisfied. These members' interests are clearly germane to the Sierra Club's mission to protect the natural environment and local wildlife and plant life. And in seeking declaratory and injunctive relief, the lawsuit does not require the participation of individual members. *See Hunt*, 432 U.S. at 343.

Because the Sierra Club satisfies the applicable standing requirements as to all of the challenged projects in its partial summary judgment motion, we may proceed to the merits of the Organizations' motion without having to address the standing of SBCC. *See Secretary of the Interior v. California*, 464 U.S. 312, 319 n.3 (1984) ("Since the State of California clearly does have standing, we need not address the standing of the other [plaintiffs], whose position here is identical to the State's."). And given my view that those legal challenges fail, I perceive no

12

obstacle to entering judgment against both the Sierra Club *and* SBCC without determining whether SBCC has standing. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 98–100 (1998).

**B**

In my view, California and New Mexico have presented sufficient evidence to demonstrate that they have standing based on their inability to enforce their environmental laws.[4]

The Secretary of Defense has directed DoD to undertake the 11 border barrier projects "without regard to any other provision of law that could impede such expeditious construction in response to the national emergency," and "[s]uch laws include, but are not limited to, the National Environmental Policy Act, the Endangered Species Act, . . . [and] the Clean Water Act." Because the Clean Water Act would otherwise require compliance with certain state water pollution requirements, *see, e.g.*, 33 U.S.C. §§ 1323(a), 1341(a), setting aside the Clean Water Act prevents California from enforcing state water quality standards. Similarly, because the Clean Air Act would otherwise require compliance with certain state air pollution requirements, *see, e.g.*, 42 U.S.C. §§ 7418(a), 7506(c)(1),

---

[4] I express no view as to whether the majority is correct in concluding that California and New Mexico have standing based on the theory that the construction will cause actual environmental harm to species within those States. *See* Maj. Opin. at 15–21.

13

setting aside the Clean Air Act likewise prevents California and New Mexico from enforcing certain state air quality standards. Because § 2808 *itself* gives the Secretary the simultaneous authority to undertake emergency military construction projects *and* to do so "without regard to any other provision of law," this asserted injury to California and New Mexico's sovereign interests is fairly traceable to DoD's invocation of § 2808, and an injunction aimed at the use of military construction funds appropriated for other purposes to build border barriers under § 2808 in the 11 project areas would redress this injury. *Cf. California v. Trump*, 963 F.3d at 960 (Collins, J., dissenting) (where preemption of state environmental laws was due to a *different* statute than the one authorizing the transfer of appropriated funds, an injunction aimed at the transfers would not undo the preemption of state law and would not redress the associated injury to the States' sovereign interests).

Because California and New Mexico satisfy the applicable standing requirements as to all seven of the challenged projects in their partial summary judgment motion, we are free to proceed to the merits of the States' motion without having to address the standing of the other States. *See Secretary of the Interior v. California*, 464 U.S. at 319 n.3. And given my view that those legal challenges fail, I perceive no obstacle to entering judgment against California, New Mexico, *and* the remaining States without determining whether the remaining States have

14

standing.  *See Steel Co.*, 523 U.S. at 98–100.[5]

### III

Our next task is to determine whether the Plaintiffs have asserted a viable

cause of action that properly brings the lawfulness of the construction projects

before us.  *See Air Courier Conf. v. American Postal Workers Union AFL-CIO*,

498 U.S. 517, 530–31 (1991).  The majority holds that the States have a valid

cause of action under the APA to challenge DoD's construction efforts and that the

Organizations have a constitutional cause of action under the Appropriations

Clause.  *See* Maj. Opin. at 41, 46–47.  Because I conclude that the Organizations

and States have a cause of action under the APA to challenge the various projects

they challenge here, there is no need in this case to address whether any of them

would also have a cause of action under the Constitution or under an equitable

"ultra vires" theory.[6]  So long as they have at least one viable cause of action, the

---

[5] I therefore also have no occasion to address whether the majority is correct in concluding that the remaining States may assert Article III standing based on the theory that, due to the deferral of particular military construction projects within their borders, those States have assertedly suffered a loss of economic activity and tax revenues.  *See* Maj. Opin. at 27–32.

[6] Although the Organizations invoke the APA only as a fallback to their preferred non-statutory claims, I think it is appropriate to first consider whether they have a *statutory* cause of action under the APA.  *Cf. Chamber of Commerce v. Reich*, 74 F.3d 1322, 1326–27 (D.C. Cir. 1996) (suggesting that, if a plaintiff relies on both the APA and non-statutory-review claims, the APA claim should be considered first); *see also California v. Trump*, 963 F.3d at 956 (Collins, J., dissenting).

15

merits of whether DoD's construction projects are lawful are properly before us. *See Air Courier Conf.*, 498 U.S. at 530–31. And because the success of these other asserted causes of action ultimately turns on whether DoD's construction efforts are lawful, and because I also conclude that those efforts *are* lawful, any consideration of whether these other causes of action actually exist would make no difference here.

In authorizing suit by any person "adversely affected or aggrieved by agency action within the meaning of a relevant statute," 5 U.S.C. § 702, the APA incorporates the familiar zone-of-interests test, which reflects a background principle of law that always "applies unless it is expressly negated," *Bennett v. Spear*, 520 U.S. 154, 163 (1997); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014).[7] That test requires a plaintiff to "establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan v. NWF*, 497 U.S. at 883 (quoting *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 396–97

---

[7] The Supreme Court has not squarely addressed whether the zone-of-interests test applies to a plaintiff who claims to have "suffer[ed] legal wrong because of agency action," which is the other class of persons authorized to sue under the APA, 5 U.S.C. § 702. *See Lujan v. National Wildlife Fed. (Lujan v. NWF)*, 497 U.S. 871, 882–83 (1990). The States and the Organizations have not invoked any such theory here, so I have no occasion to address it.

16

(1987)).  This test "is not meant to be especially demanding."  *Clarke*, 479 U.S. at 399.  Because the APA was intended to confer "generous review" of agency action, the zone-of-interests test is more flexibly applied under that statute than elsewhere, and it requires only a showing that the plaintiff is "*arguably* within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."  *Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153, 156 (1970) (emphasis added); *see also Bennett*, 520 U.S. at 163 ("what comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under the generous review provisions of the APA may not do so for other purposes") (simplified).  Because an APA plaintiff need only show that its interests are "arguably" within the relevant zone of interests, "the benefit of any doubt goes to the plaintiff."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).  In my view, the Plaintiffs have made a sufficient showing to satisfy this generous zone-of-interests test.

In applying this test, we must first identify the "statutory provision whose violation forms the legal basis for [the] complaint" or the "gravamen of the complaint."  *Lujan v. NWF*, 497 U.S. at 883, 886; *see also Air Courier Conf.*, 498 U.S. at 529.  That question is easy here.  The Organizations' complaint alleges that "[t]he President's Proclamation does not meet the conditions required for

17

invocation of 10 U.S.C. § 2808 because it does not identify an emergency requiring use of the armed forces"; that "[t]he President's Proclamation additionally does not meet the conditions required for invocation of 10 U.S.C. § 2808 because construction of a border wall is not a military construction project supporting the armed forces"; and that therefore, "Defendants are acting ultra vires in seeking to divert funding or resources pursuant to . . . 10 U.S.C. § 2808 for failure to meet the criteria required under th[at] statute[]."  The States' complaint alleges that "Defendants have acted ultra vires in seeking to divert funding pursuant to 10 U.S.C. section 2808 for failure to meet the criteria required under that statute" and that "construction of the border wall: (a) is not a 'military construction project'; (b) does not 'require[] use of the armed forces'; and (c) is not 'necessary to support such use of the armed forces.'"[8]  Section 2808 is plainly the "gravamen of the complaint," and it therefore defines the applicable zone of interests.  *Lujan v. NWF*, 497 U.S. at 886.

Although both the Organizations and the States also invoke the Appropriations Clause and the constitutional separation of powers in contending that Defendants' actions are unlawful, any such constitutional violations here can

---

[8] While their complaints mention the President's proclamation, neither the Organizations nor the States seek to overturn the proclamation or assess its validity.  They only challenge whether the declared national emergency satisfies the qualifications in § 2808.

18

be said to have occurred *only if* the construction efforts violated the limitations set forth in § 2808: if Congress authorized DoD to undertake the construction projects, and to fund those projects using unobligated funds that were appropriated for other purposes, then that money has been spent "in Consequence of Appropriations made by Law," U.S. CONST. art. I, § 9, cl. 7, and the Executive has not otherwise transgressed the separation of powers.[9] *All* of Plaintiffs' theories for challenging the construction projects—whether styled as constitutional claims or as statutory claims—thus rise or fall based on whether DoD has transgressed the limitations set forth in § 2808. As a result, § 2808 is obviously the "statute whose violation is the gravamen of the complaint." *Lujan v. NWF*, 497 U.S. at 886. To maintain a claim under the APA, therefore, the Plaintiffs must establish that they are within the zone of interests of § 2808. On this point, the majority and I are in apparent agreement. *See* Maj. Opin. at 43.[10]

---

[9] Plaintiffs also contend that § 2808 *itself* violates the Appropriations Clause and the constitutional separation of powers, but for reasons that I explained in rejecting the analogous argument made in the prior appeals, any such contention is wholly frivolous. *See California v. Trump*, 963 F.3d at 963 (Collins, J., dissenting).

[10] Plaintiffs also assert that DoD's ability to spend the funds at issue under § 2808 is displaced by § 739 of Division D of the Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, 133 Stat. 13, 197 (2019). I do not separately consider the zone-of-interests test with respect to § 739 because (1) I see no reason why a plaintiff within the zone of interests of § 2808 would not be an appropriate plaintiff to make that additional argument against the lawfulness of DoD's invocation of § 2808, and (2) for reasons I shall explain, I agree that the Sierra Club, California, and New

Having identified the relevant statute, our next task is to "discern the interests arguably to be protected by the statutory provision at issue" and then to "inquire whether the plaintiff's interests affected by the agency action in question are among them." *National Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 492 (1998) (simplified). Although I concluded in the prior appeals that the Plaintiffs were *not* within the zone of interests of the particular appropriations-statute at issue there, § 2808 differs from that statute in a critical respect that warrants a different conclusion here.

In the prior appeals, the transfer of appropriated funds occurred pursuant to "§ 8005" of the relevant annual appropriations law. In concluding that the Plaintiffs did not fall within the zone of interests of that provision, I noted that § 8005 did not "mention environmental interests"; that it did not "require the Secretary to consider such interests"; that environmental harms were "not among the harms that § 8005's limitations seek to address or protect"; and that § 8005 did "not itself mention or contemplate the displacement of state [environmental] laws." *See California v. Trump*, 963 F.3d at 959–60 (Collins, J., dissenting); *see also id*. at 960 (noting that any injury to the States' sovereign interests in enforcing their environmental laws was the result of a "separate determination" under "a

---

Mexico satisfy the zone-of-interests test with respect to § 2808. In any event, I conclude that Plaintiffs' contentions based on § 739 lack merit. *See infra* at 41–43.

20

completely separate statute"). Here, the opposite is true. On its face, § 2808 authorizes the Secretary to undertake emergency military construction "without regard to any other provision of law," and although environmental laws are not specifically mentioned, they are one of the most familiar potential obstacles to carrying out construction projects, and such laws are thus within the contemplation of this language. Because an invocation of § 2808 thus *itself* sets aside the environmental laws that protect the interests asserted by the Plaintiffs here, the *limitations* in § 2808 on the exercise of that authority arguably protect the Organizations' environmental interests and the States' sovereign interests in enforcing their environmental laws. Because the Plaintiffs' asserted harms are thus "among the harms that [§ 2808's] limitations seek to address or protect," and § 2808 "itself . . . contemplate[s] the displacement of state [environmental] laws," Plaintiffs are within the zone of interests of § 2808. *California v. Trump*, 963 F.3d at 959–60 (Collins, J., dissenting).

The Supreme Court's decision in *Patchak* confirms the correctness of this conclusion. In *Patchak*, the Secretary of the Interior had been granted statutory authority to "acquire property 'for the purpose of providing land for Indians.'" 567 U.S. at 211 (quoting 25 U.S.C. § 465). The plaintiff lived near land that the Secretary had acquired in trust for a tribe seeking to open a casino, and the plaintiff claimed that he would suffer "economic, environmental, and aesthetic harms from

21

the casino's operation." *Id.* at 211–12. In addressing whether the plaintiff's asserted harms fell within the statute's zone of interests, the Court emphasized that "[t]he question is not whether § 465 seeks to benefit Patchak; everyone can agree it does not." *Id.* at 225 n.7. "The question is instead . . . whether *issues of land use* (arguably) fall within § 465's scope—because if they do, a neighbor complaining about such use may sue to enforce the statute's limits." *Id.* (emphasis added). The Court answered that question in the affirmative, because the land-acquisition decisions contemplated by the statute were "closely enough and often enough entwined with considerations of land use" to make any difference between the two "immaterial." *Id.* at 227. A similar logic applies here. As is confirmed by the Secretary's memorandum simultaneously invoking § 2808 and waiving environmental laws under that statute, environmental considerations are entwined with military construction under § 2808 "from start to finish," *id.*, and are plainly within the "scope" of that provision, *id.* at 225 n.7. Because the Sierra Club's environmental interests, and California's and New Mexico's sovereign interests, are affected by the waiver of environmental laws occasioned by the invocation of § 2808, those Plaintiffs are arguably within § 2808's zone of interests and "may sue" under the APA "to enforce the statute's limits." *Id.*[11]

---

[11] Because this narrower ground provides an adequate basis for concluding that California and New Mexico have a cause of action under the APA, I express no view as to whether the majority is correct in its broader theory that any State that

22

## IV

Although the Sierra Club, California, and New Mexico have a cause of action under the APA, I conclude that their claims fail on the merits because DoD properly invoked § 2808 in undertaking these 11 projects.

Section 2808(a) provides:

> In the event of a declaration of war or the declaration by the President of a national emergency in accordance with the National Emergencies Act (50 U.S.C. 1601 et seq.) that requires use of the armed forces, the Secretary of Defense, without regard to any other provision of law, may undertake military construction projects, and may authorize the Secretaries of the military departments to undertake military construction projects, not otherwise authorized by law that are necessary to support such use of the armed forces. Such projects may be undertaken only within the total amount of funds that have been appropriated for military construction, including funds appropriated for family housing, that have not been obligated.

10 U.S.C. § 2808(a). "Military construction" is defined by the statute as "any construction, development, conversion, or extension of any kind carried out with respect to a *military installation*," as well as "any acquisition of land or construction of a defense access road." *Id*. § 2801(a) (emphasis added). A "military installation," in turn, is defined as "a base, camp, post, station, yard, center, or *other activity under the jurisdiction of the Secretary of a military department*." *Id*. § 2801(c)(4) (emphasis added).

---

"stood to benefit significantly from federal military construction funding" falls within the zone of interests of § 2808. *See* Maj. Opin. at 45.

23

Under the plain language of these provisions, three requirements must be satisfied in order for DoD's construction activities to comply with § 2808. First, the President must have declared that there exists a national emergency that requires use of the armed forces. Second, the 11 border barrier construction projects must qualify as "military construction" projects within the meaning of the statute. And third, the projects must be "necessary to support [the] use of the armed forces." Here, all three requirements are satisfied.

## A

Section 2808 authorizes the undertaking of military construction projects "[i]n the event of a declaration of war or the declaration by the President of a national emergency in accordance with the National Emergencies Act ["NEA"] (50 U.S.C. 1601 et seq.) that requires use of the armed forces." 10 U.S.C. § 2808(a). In my view, this requirement for invoking § 2808 is satisfied here.

The President has issued Proclamation 9844 expressly invoking § 201 of the NEA, which is the provision of the NEA that authorizes the President to declare a national emergency that would, in turn, authorize the invocation of emergency powers set forth in other statutes. 50 U.S.C. § 1621(a). Specifically, Proclamation 9844 expressly declares that "[t]he current situation at the southern border . . . constitutes a national emergency," and it briefly explains the basis for the President's determination. 84 Fed. Reg. at 4949. And in accordance with § 301 of

24

the NEA, which requires the President to personally specify which emergency powers have been invoked, the Proclamation further determines "that this emergency requires use of the Armed Forces and . . . that the construction authority provided in section 2808 of title 10, United States Code, is invoked and made available." *Id.* There has thus been an express "declaration by the President of a national emergency in accordance with the [NEA] that requires use of the armed forces," 10 U.S.C. § 2808(a), and this element of § 2808 is therefore satisfied here.

The States do not contest this element, but the Organizations do, at least in part. The Organizations do not dispute that the President has properly declared a national emergency,[12] and they acknowledge that the President has expressly declared that this emergency requires use of the armed forces. They contend, however, that the national emergency does not *actually* require use of the armed forces and that § 2808 therefore may not be invoked. This argument fails.

The relevant language of § 2808 states that, "[i]n the event of . . . the declaration by the President of a national emergency in accordance with the [NEA] that requires use of the armed forces," the Secretary of Defense may undertake

---

[12] We therefore have no occasion in this case to address the issues raised by certain *amici curiae* as to whether the President was correct in concluding that the situation at the southern border properly qualifies as a "national emergency." We likewise are not presented with any issue concerning the availability of any other emergency authority under any other statute, nor do we have before us any possible constitutional limitations on the use of any such other authorities.

25

appropriate military construction.  10 U.S.C. § 2808(a).  At the outset, it is important to note that the quoted statutory requirement is *not* satisfied unless (at a minimum) the President declares, not just a "national emergency," but specifically a "national emergency . . . that requires use of the armed forces."  No party disputes this point, but in any event, it is the grammatically preferable reading of the statutory text.  Because the phrase "that requires use of the armed forces" clearly modifies "national emergency"—which is the immediate object of the "declaration"—the most natural reading of the language is that the President must *declare* a "national emergency . . . that requires use of the armed forces."  It seems highly unlikely that, in using this phrasing, Congress intended for the President merely to declare an "emergency" and then to have some unspecified person *separately* determine that the emergency is one "that requires use of the armed forces."  Indeed, given that the "Secretary of Defense" is expressly the one to whom § 2808 grants the emergency construction authority, one would have expected that, if someone other than the President was intended to make this determination, it would necessarily be the Secretary of Defense—in which case one would have expected to see such a specification included in the later language in § 2808 about the authority of the "Secretary of Defense."

But once it is recognized that the President's "declaration" must itself include the determination that the emergency "requires use of the armed forces,"

the Organizations' statutory argument collapses.  By its terms, this statute is triggered, not by the *existence* of the specified kind of "national emergency," but by the "*event of a declaration*" of such an emergency.  10 U.S.C. § 2808(a) (emphasis added).  If (as I have explained) the requirement that the emergency must be one "that requires use of the armed forces" pertains to the "declaration" itself, then that phrase merely describes the *content* of the required "declaration" and does not supply a freestanding requirement to be examined *separately* from that declaration.  As a result, the statute does not require a separate inquiry into whether the findings made by the President in the required declaration are substantively valid; it merely requires a "declaration" meeting the statutory requisites.  Those are that the declaration be made "by the President"; that it be made "in accordance with the [NEA]"; and that it declare a "national emergency" and declare that the emergency "requires use of the armed forces."  10 U.S.C. § 2808(a).  All three requirements have been met here, as explained earlier.  This portion of the statute requires nothing more, and so this initial element of § 2808 is satisfied.

**B**

To qualify as "military construction" that is authorized under the emergency authority granted in § 2808(a), the construction generally must be carried out "with

27

respect to a military installation." 10 U.S.C. § 2801(a).[13] Section 2801(c)(4) defines the term "military installation" to "mean[] a base, camp, post, station, yard, center, or *other activity under the jurisdiction of the Secretary of a military department*." *Id*. (emphasis added). Accordingly, so long as the border-barrier construction occurs with respect to one of these enumerated items, that construction qualifies as "military construction." Plaintiffs do not dispute that the two projects that are taking place within the Barry M. Goldwater Range are being carried out with respect to a "military installation," *see* Maj. Opin. at 61 n.10, and so the only question here is whether the other nine projects also fit the definition of "military construction." Because those nine construction projects involve an "activity under the jurisdiction" of a military Secretary, they constitute "military construction" within the plain meaning of the statute.

By its terms, the statute authorizes any construction project "of any kind" that is "carried out with respect to" an "*activity* under the jurisdiction of the Secretary of a military department." 10 U.S.C. § 2801(a), (c)(4) (emphasis added). An "activity" is a "specified pursuit in which a person partakes," *see Activity*, AMERICAN HERITAGE DICTIONARY (5th ed. 2018), or in which a group of persons participates, *see Activity*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("The

---

[13] One exception, which is relevant to certain of DoD's actions here, is that "military construction" also "includes . . . any acquisition of land" by DoD, without any further statutory limitation. 10 U.S.C. § 2801(a).

28

collective acts of one person or of two or more people engaged in a common enterprise."); *see also Activity*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY ("WEBSTER'S THIRD") ("an occupation, pursuit, or recreation in which a person is active").  Although "activity under the jurisdiction" of a military department thus broadly denotes any specific *task* of those departments, and does not itself denote a *place*, the term embraces places under military jurisdiction, because activities under military jurisdiction necessarily occur there.  As the Supreme Court has explained, a "place . . . where military duty is performed" is "synonymous with the exercise of *military jurisdiction*," and that "is precisely how the term 'military installation' is used" in § 2801(c)(4).  *United States v. Apel*, 571 U.S. 359, 368 (2014).  Accordingly, land that is under military jurisdiction counts as a "military installation."  And, as the majority notes, "Plaintiffs do not contest that the sites are under military jurisdiction."  *See* Maj. Opin. at 67.  Indeed, the point is incontestable, because the land involving the nine relevant construction projects has been lawfully assigned to the jurisdiction of U.S. Army Garrison Fort Bliss, an Army base.  This element of § 2808 is therefore also satisfied.

The majority nonetheless rejects this reading as contrary to *ejusdem generis*, "the statutory canon that where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words," *Circuit City*

29

*Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001) (simplified). *See* Maj. Opin. at 65–66. According to the majority, the nine project areas at issue here are insufficiently similar to the enumerated items—*i.e.*, a "base, camp, post, station, yard, or center"—to be properly included within the final generic phrase, "other activity under the jurisdiction" of a military department. *Id*. at 66. For several reasons, this argument fails.

As an initial matter, the majority overlooks the fact that *ejusdem generis* "does not control . . . when the whole context dictates a different conclusion." *Norfolk & W. Ry. Co. v. American Train Dispatchers Ass'n,* 499 U.S. 117, 129 (1991). Here, the generic term used—"other activity"—is notably dissimilar from each of the terms which precedes it, thereby precluding any effort to invoke *ejusdem generis* to narrow it. If the statute had referred to any "base, camp, post, station, yard, center, or other *place* under the jurisdiction" of the military, the majority's argument might have had some superficial force—although it still would be wrong for the additional reasons I will describe momentarily. But the generic term "activity" refers to *actions*, not places, and is simply not within the same class as the enumerated items. This shift unmistakably denotes an intention to go *beyond* the ordinary, established military facilities that are enumerated and to allow construction in support of *whatever activities* the military needs to conduct to address the national emergency. Ironically, consideration of this canon thus

30

points towards an even *broader* reading of the generic term than the Government urges here. And Plaintiffs would plainly lose under that broader view, because it is simply indisputable that the construction projects here are all "carried out with respect to" an "*activity* under the jurisdiction" of a military department. 10 U.S.C. § 2801(a), (c)(4) (emphasis added).

In any event, the majority's application of *ejusdem generis* fails for the additional reason that it overlooks the fact that the statute *itself* tells us what the unifying characteristic of the enumerated items is—namely, they are all places "*under the jurisdiction of the Secretary of a military department.*" 10 U.S.C. § 2801(c)(4) (emphasis added). Where, as here, the generic term explicitly defines the common feature, it would "not give the words a faithful interpretation if we confined them more narrowly than the class of which they are a part." *Cleveland v. United States*, 329 U.S. 14, 18 (1946) (rejecting invocation of *ejusdem generis* to narrow the scope of the generic term "any other immoral purpose" in the Mann Act, so that it would only apply to sex trafficking and not to polygamy). The statute thus requires nothing more than that the place be "under the jurisdiction" of a military department, and all agree that that requirement is satisfied here.

The majority contends that this reading of the text cannot be correct because the resulting flexibility in emergency construction authority would be, in the

31

majority's view, unreasonably broad and "would run afoul of the constitutional separation of powers." *See* Maj. Opin. at 70. Both contentions are wrong.

As to the first, the majority overlooks the fact that the exact same grant of construction authority at issue here applies, not just in the event of a "declaration . . . of a national emergency," but also "[i]n the event of a *declaration of war*." 10 U.S.C. § 2808(a) (emphasis added). It is hardly surprising that Congress has granted extremely broad emergency authority to "redirect [construction] funds at will without regard for the normal appropriations process" in the event of a formal declaration of war. *See* Maj. Opin. at 69. Given that the statute grants, in a single clause, the very same wartime authority in the event of a declaration of a national emergency, we lack any textual basis whatsoever for imposing artificial limits on the breadth of that authority. The majority obviously thinks that it was unwise for the Executive to have such an "unnecessarily expansive" construction authority in the event of a national emergency, *see id.* (citation omitted), but that is unmistakably what Congress said in § 2808(a). The majority vaguely hints that it does not think that the current situation constitutes a *real* "national emergency" that would warrant such broad authority. *See id.* at 70 (noting that the NEA should "be utilized only in time of genuine emergency" (citation omitted)). But no party here contends that the President's declaration of a national emergency was not "in

32

accordance with the [NEA]," as required by § 2808(a), and so that issue is not before us. *See supra* note 12.

The majority is also wrong in contending that Congress's grant of such flexibility raises separation-of-powers concerns. The majority argues that allowing this much flexibility over how to spend funds appropriated for military construction would infringe on Congress's "exclusive control over appropriations." *See* Maj. Opin. at 70. The suggestion is, as I have previously explained, "'wholly insubstantial and frivolous,'" *see California v. Trump*, 963 F.3d at 963 (Collins, J., dissenting) (quoting *Bell v. Hood*, 327 U.S. 678, 682–83 (1946)), given that the Constitution indisputably allows Congress to make a "'*lump-sum* appropriation'" that leaves the exact "'allocation of funds'" to the discretion of the Executive, *id*. (quoting *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993)) (emphasis added). The emergency construction authority granted by § 2808 is not meaningfully distinguishable, for constitutional purposes, from a lump-sum appropriation for military construction. The majority states that there is nonetheless an appropriations-power concern here because Congress has made clear its opposition to these specific projects, "though imperfectly," by "declin[ing] to fund the very projects at issue" in DHS's appropriations statute and by "attempt[ing] to terminate the declaration of a national emergency (twice)." *See* Maj. Opin. at 70. But Congress has not *enacted* any relevant limitation, and under *INS v. Chadha*, 462

33

U.S. 919 (1983), we have no business undertaking to give legal effect to our own perceptions of the "big-picture 'denial' [of funding] that we think is implicit in the 'real-world events in the months and years leading up to the 2019 appropriations bills.'" *California v. Trump*, 963 F.3d at 972 (Collins, J., dissenting) (citation omitted).

Because the 11 border barrier construction projects here are all taking place with respect to land that is under the jurisdiction of the Secretary of a military department, they are taking place with respect to a military installation. This requirement of § 2808 is thus also satisfied.

## C

The final requirement of § 2808 is that the military construction projects undertaken by the Secretary of Defense must be "necessary to support such use of the armed forces." 10 U.S.C. § 2808(a). In determining that this requirement was satisfied with respect to the 11 border barrier construction projects at issue here, the Secretary of Defense explained his reasoning as follows:

> These projects will deter illegal entry, increase the vanishing time of those illegally crossing the border, and channel migrants to ports of entry. They will reduce the demand for DoD personnel and assets at the locations where the barriers are constructed and allow the redeployment of DoD personnel and assets to other high-traffic areas on the border without barriers. In short, these barriers will allow DoD to provide support to DHS more efficiently and effectively. In this respect, the contemplated construction projects are force multipliers.

This determination is more than sufficient to satisfy this final requirement of § 2808.

The Government contends that the Secretary's determination is "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and is therefore unreviewable under the APA. In my view, it is not necessary to decide that issue, because even assuming *arguendo* that this APA exception is inapplicable, the Secretary's determination is well within the bounds of § 2808. By requiring that the construction be "necessary" to the contemplated use of the armed forces, § 2808 does not limit the Secretary to only those projects that are, as the majority contends, "absolutely needed" or "required." *See* Maj. Opin. at 52 (citation omitted). As the Supreme Court has explained, the term "necessary" does not always denote "essential," because "*in ordinary speech*, the term is often used more loosely to refer to something that is merely important or strongly desired." *Ayestas v. Davis*, 138 S. Ct. 1080, 1093 (2018) (emphasis added); *see also id*. ("necessary" may "import that which is only convenient, useful, appropriate, suitable, proper, or conducive to the end sought" (citation omitted)). By confirming that this broader meaning of "necessary" is consistent with how the word is used in "ordinary speech," *see id*., *Ayestas* puts the lie to the majority's untenable contention that this broader meaning is not consistent with "*any* ordinary understanding of the word," *see* Maj. Opin. at 52 (emphasis added), and is instead

35

a peculiarity of the caselaw concerning the Constitution's Necessary and Proper Clause, *id*. at 52–54.[14]   Indeed, the majority acknowledges that "necessary" has the same general meaning as "required," and I have already explained why that latter term likewise "includes 'something that is wanted or needed' or 'something called for or demanded.'"  *California v. Trump*, 963 F.3d at 974 (Collins, J., dissenting) (quoting *Requirement*, WEBSTER'S THIRD).  We should be loathe to reject this familiar and more flexible use of the term, especially given that we are construing the scope of the emergency authority that is available to be exercised during the course of a "war" or "national emergency."  *Cf. Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008) ("great deference" is generally given to the military's judgment of the importance of a military interest).

With this understanding of "necessary" in mind, I think it is clear that the Secretary properly determined that the construction projects here are "necessary to support such use of the armed forces."  10 U.S.C. § 2808(a).  By referring to "*such* use of the armed forces," the statute refers back to the "use of the armed forces" that the President has determined is "require[d]" by the "national emergency" that

---

[14] The majority attempts to distinguish *Ayestas* on the ground that the relevant statutory phrase there was "reasonably necessary" and not just "necessary."  *See* Maj. Opin. at 55 n.9.  This effort fails, because, in the course of construing the statutory language at issue in *Ayestas*, the Supreme Court first addressed the use of the word "necessary"—by itself—in "ordinary speech," and it is *that* explication that refutes the majority's flawed analysis.  *See* 138 S. Ct. at 1093.

36

he has declared.  *Id.* (emphasis added).  In Proclamation 9844, the President noted that DoD had been "provid[ing] support and resources to the Department of Homeland Security at the southern border," and he determined that it is "necessary for the Armed Forces to provide additional support to address the crisis" at the southern border.  84 Fed. Reg. at 4949.  This determination does not entail an entirely novel use of the armed forces, because Congress has repeatedly recognized a support role for DoD at the border.  *See*, *e.g.*, 10 U.S.C. §§ 251–252, 271–284.  Because the "use of the armed forces" that has been declared necessary by the President is thus the *provision of support to DHS* in securing the border, the only question before us is whether the Secretary properly determined that the 11 construction projects are "necessary to support *such* use of the armed forces."  10 U.S.C. § 2808(a) (emphasis added).  That standard is easily satisfied, because the construction projects, by "allow[ing] the redeployment of DoD personnel and assets to *other* high-traffic areas on the border without barriers," will permit "DoD to provide support to DHS more efficiently and effectively."  By allowing DoD to help cover a wider area with fewer personnel, the "contemplated construction projects are force multipliers."

The majority wrongly ignores the statutory language focusing on whether the construction projects are necessary to support "such use of the armed forces," 10 U.S.C. § 2808(a)—*viz.*, the use of the armed forces to "provide support and

37

resources to the Department of Homeland Security at the southern border." 84 Fed. Reg. at 4949. As a result, the majority gets things exactly backwards when it says that the construction does not support such use of the armed forces here *because* it will "support and benefit DHS." *See* Maj. Opin. at 50–52. Given that, under the terms of the statute, military support for DHS's mission *is* the relevant "use of the armed forces" that has been declared by the President, the fact that the construction furthers *that* mission weighs decidedly in favor of finding that it is "necessary to support such use of the armed forces." 10 U.S.C. § 2808(a). The majority's contrary conclusion rests on the implicit view that *this court* gets to substitute its own view of when the armed forces are needed in a national emergency for the view of the President as stated in the emergency declaration. Nothing in § 2808(a) assigns us that task. *See supra* at 26–27. As relevant here, § 2808 merely instructs us to consider whether the Secretary properly determined that these projects are "necessary" to support the President's *declared* use of the armed forces.

*     *     *

Because all of the requirements of § 2808(a) have been met, the 11 military construction projects at issue here were authorized by that section. Plaintiffs' claims resting on a contrary view fail on the merits.

38

# V

Plaintiffs' final argument on the merits is that, even if the construction was otherwise authorized under § 2808, DoD's power to invoke that authority was effectively disabled by § 739 of the Financial Services and General Government Appropriations Act, 2019, which is Division D of the Consolidated Appropriations Act, 2019. This argument is unavailing.

Section 739 provides, in its entirety, as follows:

> None of the funds made available in this or any other appropriations Act may be used to increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act.

Pub. L. No. 116-6, Div. D, § 739, 133 Stat. 13, 197 (2019). Plaintiffs' argument is that DoD's invocation of emergency military construction authority alters funding levels from what was proposed in the budget or enacted in the 2019 appropriations statutes, and that § 2808 cannot be used to justify that alteration because it is not a provision of an "appropriations Act." *Id.* Therefore, according to Plaintiffs, § 739 bars any use under § 2808 of any "funds made available" in *any* appropriations act. This argument lacks merit, because it fails to construe the language of § 739 in light of the appropriations context against which its terms must be understood. *Home Depot U.S.A., Inc. v. Jackson*, 139 S. Ct. 1743, 1748 (2019) ("It is a

39

fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.") (simplified).

As I have previously explained, the terms of an appropriations-law restriction "can only be understood against the backdrop of th[e] [appropriations] process" and must take account of any settled meanings attached to the particular terms used as well as any established understanding surrounding the budgetary practices being referenced. *California v. Trump*, 963 F.3d at 968 (Collins, J., dissenting). Here, the relevant language of § 739 refers to action to "[1] increase, eliminate, or reduce funding [2] for a program, project, or activity," and both portions of this phrase align with familiar concepts in the budgetary process.

Specifically, the phrase "program, project, or activity" ("PPA") is a phrase of art that refers to an "element within a budget account." *See* U.S. GOV'T ACCOUNTABILITY OFF. ("GAO"), GAO-05-734SP, *A Glossary of Terms Used in the Federal Budget Process* 80 (2005) ("*Glossary*"); *see generally* 31 U.S.C. § 1112 (requiring GAO to "establish, maintain, and publish standard terms and classifications for fiscal, budget, and program information of the Government"). "For annually appropriated accounts, the Office of Management and Budget (OMB) and agencies identify PPAs by reference to committee reports and budget justifications." *Glossary*, *supra*, at 80. Similarly, an action to "increase, eliminate,

40

or reduce" funding for a PPA corresponds to the familiar budgetary concepts of a reprogramming or transfer of funds. The GAO defines a "reprogramming" as "[s]hifting funds *within* an appropriation or fund account to use them for purposes other than those contemplated at the time of appropriation; it is the shifting of funds from one object class to another within an appropriation or from one program activity to another." *Id*. at 85 (emphasis added). A transfer, by contrast, is defined as a "[s]hifting of all or part of the budget authority in one appropriation or fund account to another." *Id*. at 95; *see also California v. Trump*, 963 F.3d at 969 (Collins J., dissenting). Viewed against this backdrop, § 739's reference to action that would "increase, eliminate, or reduce funding for a program, project, or activity" clearly refers to the sort of change in funding that would require the agency to undertake a formal reprogramming or transfer. That reading of the phrase is further confirmed by the remainder of § 739, which states that such action may not be undertaken "unless such change is made pursuant to the *reprogramming or transfer provisions* of this or any other appropriations Act." *See* 133 Stat. at 197 (emphasis added).

This understanding of § 739 confirms that it does not apply to an invocation of emergency military construction authority under § 2808. Under longstanding DoD budgetary guidelines, an allocation of funds under the emergency military construction authority in § 2808 is *not* considered to be a "reprogramming" or

41

"transfer" because such allocations take place outside of "the normal planning, programming, and budgeting process." *See* Department of Defense Directive 4270.5, ¶ 4.1 (February 12, 2005); *see also id.* at ¶ 4.2 ("Reprogramming is not necessary for projects under Sections 2804 and 2808[.]"). Congress is presumably well aware of this settled understanding as to how an allocation of funds under § 2808 is considered for budgetary purposes. *See Lorillard v. Pons*, 434 U.S. 575, 581 (1978); *see also Bragdon v. Abbott*, 524 U.S. 624, 631, 645 (1998); *see generally* U.S. GOV'T ACCOUNTABILITY OFF., PRINCIPLES OF FEDERAL APPROPRIATIONS LAW (4th ed. 2016 rev.), pt. B, § 7, 2016 WL 1275442, at *6–7 (whether a reprogramming has occurred would be evaluated in light of the relevant budgetary documents and understandings). Indeed, Directive 4270.5 is prominently cross-referenced in the discussion of § 2808 authority contained in DoD's governing "Financial Management Regulation," *see* DoD Financial Management Regulation 7000.14-R, Vol. 3, Chap. 17 at 17-17 (2019), and Congress is obviously familiar with that important document, which it has even expressly cited in the 2019 military construction appropriations law, *see* Military Construction, Veterans Affairs, and Related Agencies Appropriations Act, 2019, Pub. L. No. 115-244, Div. C, § 123, 132 Stat. 2897, 2953 (2018). Section 739's reference to the sort of actions that would trigger a reprogramming or transfer thus

does not include an allocation of funding under the emergency military construction authority granted in § 2808.

Any doubt on this score is confirmed by the doctrine disfavoring repeals by implication, which "'applies with full vigor when . . . the subsequent legislation is an *appropriations* measure.'" *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 190 (1978) (quoting *Committee for Nuclear Responsibility, Inc. v. Seaborg*, 463 F.2d 783, 785 (D.C. Cir. 1971)); *see also Rostker v. Goldberg*, 453 U.S. 57, 74–75 (1981) (noting the "sound principle[] that appropriations legislation should not be considered as modifying substantive legislation."). Section 2808 allows the Secretary of Defense to "undertake military construction projects" notwithstanding "any other provision of law." It would be remarkable to conclude that this emergency authority—a critical power that allows our nation and military to respond quickly in times of war or national emergency—was impliedly (if not accidentally) disabled in a later appropriations bill that makes no reference to § 2808 or to emergency powers. This canon further confirms what the budgetary context already makes clear, which is that § 739 poses no bar to DoD's use of § 2808.

## VI

Based on the foregoing, I conclude that at least the Sierra Club, California, and New Mexico have Article III standing. They have a cause of action under the

43

APA to challenge these § 2808 military construction projects, but their claims fail on the merits as a matter of law because the projects comply with the limitations in § 2808 and because § 739 is inapplicable here.  I therefore would reverse the district court's partial grant of summary judgment to the Organizations and to the States and would remand with instructions to grant Defendants' motions for summary judgment on this set of claims.[15]  I respectfully dissent.

---

[15] In light of my resolution of the merits, I would not terminate the district court's stay pending appeal, and I would deny the Organizations' emergency motion to lift the stay.